[No. B181175. Second Dist., Div. Eight. June 15, 2006.]

PASADENA METRO BLUE LINE CONSTRUCTION AUTHORITY,
Plaintiff and Appellant, v.
PACIFIC BELL TELEPHONE COMPANY et al., Defendants and
Respondents.

## COUNSEL

Richards, Watson & Gerson, Mitchell E. Abbott and Sonali S. Jandial for Plaintiff and Appellant.

Douglas Ditonto, Richard D. Arko; Randall R. Morrow; Manatt, Phelps & Phillips and Michael M. Berger for Defendants and Respondents.

## OPINION

**RUBIN, J.**—Plaintiff Pasadena Metro Blue Line Construction Authority (the Authority) appeals from the summary judgment entered for defendants Southern California Edison Co. (Edison), Southern California Gas Co. (SCG), and Pacific Bell Telephone Co. (PacBell), which determined that those companies did not have to reimburse the Authority for the cost of relocating their utility lines as part of the Authority's construction of a light rail public transit line. We affirm.

### ISSUE PRESENTED

The Los Angeles County Metropolitan Transportation Authority (MTA) operates a light rail public transit system throughout the greater Los Angeles area, comprised of various lines that are designated by color names: Red Line, Green Line, and Blue Line. MTA was supposed to build an extension of

its Blue Line from Los Angeles Union Station to Pasadena.[1] Due to legal and budget problems, the MTA suspended that project. The Legislature then stepped in and created a new entity—the Authority—"for the purpose of awarding and overseeing all design and construction contracts for completion of the project." (Pub. Util. Code, § 132405; see *id.*, §§ 132400–132450.)[2]

■ Under state law, when utility lines must be moved as part of an MTA public transit project, the MTA "shall, by prior agreement," reimburse the utility for those relocation expenses. (§ 30631, subd. (b).) The MTA had entered into such agreements with various utility companies in connection with building other segments of its light rail commuter train system. Edison, SCG, and PacBell (the utility companies) all had utilities in the project's path that had to be moved during construction of the Gold Line. After the Authority stepped in to finish the project, it originally budgeted funds to pay the utility companies' relocation costs, but eventually notified them that it would pay those costs under protest, and seek to recover them later. According to the Authority, because section 30631 is, by its terms, applicable to the MTA, and because the Authority is a separate entity, that statute does not apply to it. The Authority sued the utility companies to recover those costs, and later brought a summary judgment motion. That motion was denied on the ground that section 30631 applied even though the Authority was completing the project. On appeal, the Authority contends the trial court erred. We conclude that the trial court was correct.[3]

## FACTS AND PROCEDURAL HISTORY

We begin with an overview of the transfer of power from the MTA to the Authority. The Legislature gave the Authority a broad grant of powers, including, but not limited to, all powers necessary to plan, develop, own, and build the Gold Line. (§ 132410, subd. (a).) Among these were the power to accept grants, fees, and allocations from the state, local agencies, and private entities (§ 132410, subd. (a)(1)), and the power to relocate utilities as necessary for the project. (§ 132410, subd. (a)(6).) The MTA was required to enter into an agreement with the Authority to hold in trust with the Authority "all real and personal property, and any other assets accumulated in the

---

[1] Instead of including that project as part of the Blue Line, it was eventually deemed to be a separate train route known as the Gold Line. We will hereafter refer to it by that name, or as the project. The first phase of the project, ending in Pasadena, was completed in 2003. A second phase of the Gold Line is eventually planned to extend east from there to Claremont.

[2] All further undesignated section references are to the Public Utilities Code.

[3] Applying a common law rule, the trial court also found that the Authority was responsible for the relocation costs because its activities were proprietary and not governmental. Although the efficacy of the proprietary activities rule may be archaic by today's standards, we need not reach that issue.

planning, design, and construction of the project . . . ." (§ 132425.) The MTA was required to transfer to the Authority the unencumbered balance of all local funds programmed for completion of the Gold Line and the Authority was eligible to receive state funds for the project. (§ 132430, subds. (a), (b).) The Authority was required to enter into a memorandum of understanding with the MTA to address the MTA's ability to review any significant changes in the project's scope. (§ 132435.) Upon completion of the project, the Authority would dissolve and the MTA would assume responsibility for operating the Gold Line. (§ 132450.)

Pursuant to these provisions, the Authority and the MTA entered into two agreements: a master cooperative agreement (master agreement), and a governmental purpose property trust agreement (trust agreement). The master agreement included a project schedule for the Authority that listed "Third Party Agreement—Utility Relocations" among the project tasks to be completed by the Authority. One section required the Authority to prepare various development contracts, including cooperative agreements with "utilities and the MTA . . . ." The trust agreement noted that the Legislature required "that funds from the funding program be used to pay all costs and expenses related to the completion of the Project." Therefore, all assets, and real and personal property of the MTA would be held in trust by the Authority for the MTA, and the Authority was required to hold all project funds in the name of the trust. The trust agreement also required the Authority to comply with all laws applicable to the project.

In an application to the Public Utilities Commission (PUC), the Authority said that, pursuant to sections 132425 and 132430, the MTA had transferred to the Authority "all real and personal property, and other assets, as well as the unencumbered balance of all local funds accumulated for completion of the project." In another PUC application, the Authority said that the "cost of construction and maintenance of the project, until acceptance of the project by [the MTA] shall be borne by the authority in accordance with the [master agreement]. After that time, the project would be operated by the MTA."

When the MTA built its earlier rail lines, it entered into cooperative agreements with various utility companies, under which the MTA agreed to pay the costs of utility relocation. When the Authority took over, its budget included money for the same expenses. Later, however, the Authority told the utility companies that it was exempt from section 30631, and relocated their utilities at its expense under protest, promising to seek recovery of those costs at a later time. It is undisputed that the Authority paid $153,224.96 to SCG, $132,599.47 to Edison, and $380,024.83 to PacBell for the cost of utility relocation. The Authority also claimed to have spent another $521,780.78 to have a third party relocate other PacBell facilities.

The Authority sued the utility companies for reimbursement of those costs, contending that the utility companies were obligated to pay them under both sections 6297 and 7901, and the common law. The complaint also included a claim for unjust enrichment, two common counts, and a cause of action for declaratory relief. The Authority then brought separate, but nearly identical, summary judgment motions against each utility. They responded with separate oppositions, but only PacBell's raised section 30631 as a defense. The trial court found that section 30631 applied because the Authority was acting on the MTA's behalf. Judgment for the utility companies was then entered.

## STANDARD OF REVIEW

Summary judgment is granted when a moving party establishes the right to the entry of judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) In reviewing an order granting summary judgment, we must assume the role of the trial court and redetermine the merits of the motion. In doing so, we must strictly scrutinize the moving party's papers. The declarations of the party opposing summary judgment, however, are liberally construed to determine the existence of triable issues of fact. All doubts as to whether any material, triable issues of fact exist are to be resolved in favor of the party opposing summary judgment. While the appellate court must review a summary judgment motion by the same standards as the trial court, it must independently determine as a matter of law the construction and effect of the facts presented. (*Barber v. Marina Sailing, Inc.* (1995) 36 Cal.App.4th 558, 562 [42 Cal.Rptr.2d 697].)

A plaintiff moving for summary judgment meets its burden of showing that there is no defense to a cause of action if that party has proved each element of the cause of action entitling that party to judgment on that cause of action. (Code Civ. Proc., § 437c, subd. (p)(1).) If the plaintiff does so, the burden shifts to the defendant to show that a triable issue of fact exists as to that cause of action or defense. In doing so, the defendant cannot rely on the mere allegations or denial of its pleadings, "but, instead, shall set forth the specific facts showing that a triable issue of material fact exists . . . ." (Code Civ. Proc., § 437c, subd. (p)(1).) A triable issue of material fact exists "if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. [Fn. omitted.]" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

Because we interpret a statute based on undisputed facts, we are not bound by the trial court's interpretation of the statute, and instead decide the correct interpretation as a matter of law. (*Travelers Indemnity Co. v. Maryland Casualty Co.* (1996) 41 Cal.App.4th 1538, 1543 [49 Cal.Rptr.2d 271].) " 'The

fundamental rule of statutory construction is to ascertain the intent of the Legislature in order to effectuate the purpose of the law. . . . In doing so, we first look to the words of the statute and try to give effect to the usual, ordinary import of the language, at the same time not rendering any language mere surplusage. The words must be construed in context and in light of the nature and obvious purpose of the statute where they appear. . . . The statute " 'must be given a reasonable and commonsense interpretation consistent with the apparent purpose and intention of the Legislature, practical rather than technical in nature, and which, when applied, will result in wise policy rather than mischief or absurdity. . . .' " . . . If the language of a statute is clear, we should not add to or alter it to accomplish a purpose which does not appear on the face of the statute or from its legislative history.' Statutes must be harmonized, both internally and with each other." (*Pang v. Beverly Hospital, Inc.* (2000) 79 Cal.App.4th 986, 994 [94 Cal.Rptr.2d 643], citations omitted.)

## DISCUSSION

■ Section 6297 codifies the common law rules that when a public utility accepts franchise rights in public streets, it assumes an implied obligation to pay for the relocation of its facilities when necessary to make way for a proper governmental use. That obligation arises from the paramount right of the people as a whole to use public thoroughfares. (*City of Livermore v. Pacific Gas & Electric Co.* (1997) 51 Cal.App.4th 1410, 1413 [59 Cal.Rptr.2d 852].) The Legislature may grant a utility the right to compensation for relocating its facilities, but must do so specifically. (*Id.* at p. 1414.)

■ The Legislature did so in section 30631, subdivision (b), which provides, in relevant part, that the MTA's use of streets, highways, and other public places is presumed to be no greater burden on adjoining properties than those uses existing as of August 22, 1964.[4] However, if facilities other than state highways and freeways, including, but not limited to streets, highways, pipelines, poles, communications wires, and electronic transmission wires belonging to a public agency or a private entity "are necessarily required to be relocated, replaced, or altered in order for the district to construct or operate its system, or if the construction or operation by the district of its system makes necessary the relocation, replacement, or alteration of any of those facilities . . . in order to maintain the functioning of the facilities at their previous level of service, the facilities shall be relocated,

---

[4] Section 30631 actually refers to "the district," meaning the former Southern California Rapid Transit District (RTD). (See § 30001.) However, the MTA is the statutory successor to the RTD (§ 130050.2) and assumed all of the RTD's powers, duties, and obligations. (§ 130051.13.) Any statutory reference to the RTD is deemed to apply to the MTA. (§ 130051.14.) It is generally conceded by the Authority that the MTA is therefore subject to the terms of section 30631.

replaced, or altered with reasonable promptness by the [owner] and the [MTA] shall, by prior agreement, reimburse the [owner] for the actual costs necessarily incurred in the relocation, replacement, or alteration." In short, if utilities must be moved or relocated in order to construct or operate an MTA transit system, a new and additional burden on such facilities is created and MTA must pay the relocation costs.

The Authority contends section 6297 applies, and not section 30631, because: (1) section 30631 refers to only the MTA, not any other entities; (2) the Authority is an entity separate and distinct from the MTA; and (3) because the Legislature granted the Authority the power to relocate utilities. (§ 132410, subd. (a)(6).) We disagree.

Although one portion of section 30631, subdivision (b) is called into play when "construction or operation by the district" makes relocation necessary, the statute also applies when relocation is required "in order for the district to construct or operate" its system. These two phrases could be construed to mean the same thing. However, in order to avoid rendering one of them mere surplusage, we must, if possible, interpret them differently. Construction "by" the MTA, as described in the former phrase, would seem to require direct MTA involvement. In order to avoid rendering the latter phrase mere surplusage, it must mean something else. We believe that "something else" is defined by what happened here: where another entity stepped in to finish the project with MTA funds, some of which the MTA would have used to pay for utility relocation, and where that entity held the project and all of MTA's assets in trust, returning it all for the MTA to operate when the project was finished. In short, although the project may not have been completed "by" the MTA, it was surely constructed *for* it. As noted, section 30631 requires the MTA to pay for relocating utilities because the relocation places a new burden on their owners. In doing so, the Legislature must have determined that it would be unfair to force utilities to pay to relocate their own facilities when the need to do so arose only because the MTA was constructing a mass transit project. We reject the notion that the Legislature intended to place that burden back on the utility companies simply because another entity stepped in to finish the project for the MTA. Under these unique circumstances, we believe that the utility companies' facilities were "necessarily required to be relocated . . . in order for the district to construct . . . its system" under section 30631, subdivision (b). To hold otherwise leads to both mischief and an absurd result by allowing the MTA to escape its obligations under section 30631 for no other reason than the fact that the Authority stepped in to complete the Gold Line for the MTA with MTA funds.

If the Legislature had intended otherwise, it could have said so when it created the Authority. Even though the Legislature gave the Authority the

power to relocate utilities (§ 132410, subd. (a)(6)), it also required the MTA to turn over all of its project funds and other assets to the Authority, which the Authority would hold in trust for the MTA, until construction was complete and the MTA could take over operations. (§§ 132425, 132430, subds. (a), (b), 132450.) The Legislature must have been aware that the MTA was statutorily obligated to spend some portion of its project funds to pay for utility relocation costs. As discussed above, it is equally absurd to conclude that the Legislature's grant of power to relocate utility lines, along with a transfer of MTA funds designed to pay for the relocation costs, was somehow intended to allow the Authority to complete the project for the MTA without paying those costs. We therefore conclude that section 30631, subdivision (b) applies, and that the utility companies should not have to bear the cost of relocating their facilities as part of the Gold Line project.[5]

## DISPOSITION

For the reasons set forth above, the judgment is affirmed. Respondents to recover their costs on appeal.

Cooper, P. J., and Boland, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 13, 2006, S145542.

---

[5] Our holding is not intended to determine, as between the Authority and the MTA, their respective rights or obligations in this matter. We hold only that under these circumstances, the utility companies were entitled to be reimbursed for their Gold Line related relocation costs.