Filed 7/31/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| MARY HUBBARD et al., | B249835 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BS133430) |
| v. | |
| COASTAL COMMISSION, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. James C. Chalfant, Judge. Affirmed.

Law Offices of Steven C. Gambardella and Steven C. Gambardella; and Mary A. Hubbard, in pro. per., for appellants Mary Hubbard and Save Open Space/Santa Monica Mountains.

Xavier Becerra, Attorney General, John A. Saureman, Assistant Attorney General, Christina Bull Arndt and Andrew M. Vogel, Deputy Attorneys General, for Respondent California Coastal Commission.

Under the California Coastal Act (Pub. Resources Code, § 30000, et seq.), anyone wishing to build a development in the coastal zone must obtain a coastal development permit (CDP) from the California Coastal Commission (Commission) or, if a local coastal program (LCP) has been certified by the Commission, from the applicable local government agency.  (Pub. Resources Code, § 30600, subds. (a) – (d).)  This case involves the interpretation of a regulation, Title 14, California Code of Regulations, section 13105, subdivision (a),[1]  which provides the grounds on which the Commission may revoke a CDP based on inaccurate, erroneous or incomplete information in the CDP application.  Section 13105, subdivision (a) provides:  "Grounds for revocation of a permit shall be:  [¶]  (a)  Intentional inclusion of inaccurate, erroneous or incomplete information in connection with a coastal development permit application, where the commission finds that accurate and complete information would have caused the commission to require additional or different conditions on a permit or deny an application."

Here, there was no certified LCP in place. The Commission granted a CDP to Real Party in Interest Malibu Valley Farms (MVF) to rebuild its equestrian facility following a fire.  Appellants Mary Hubbard and Save Open Space Santa Monica Mountains (appellants) petitioned the Commission to revoke the CDP, alleging that MVP's CDP application contained intentional misrepresentations regarding approvals it received from the Los Angeles County Environmental

_____

[1]     All undesignated section references are to Title 14, California Code of Regulations.

2

Review Board (ERB), the California Water Resources Control Board (Water Board), and the California Department of Fish and Game (Fish and Game).[2]

Relying on section 13105, subdivision (a), the Commission denied the petition, finding that although the CDP application contained intentional misrepresentations concerning the ERB, Water Board, and Fish and Game approvals, correction of those misrepresentations by accurate and complete information would not have caused the Commission to add new or different conditions or to deny the CDP.

Appellants petitioned the superior court for a writ of administrative mandate (Code Civ. Proc., § 1094.5) to set aside the Commission's decision. The superior court denied the petition, and it is from that ruling that appellants appeal. Appellants contend that the Commission erred in interpreting and applying section 13105, subdivision (a), in that: (1) the plain meaning of section 13105, and the interplay between the language of sections 13052 and 13105, require a CDP application to have complete and accurate information regarding state and local agency approvals of the proposed project; (2) the legislative intent behind sections 13052 and 13105 indicates that a CDP applicant cannot benefit from its failure to comply with the state and local agency approval procedural requirements; and (3) revoking a CDP only if the inaccuracies regarding local and state agency approvals are

---

[2] Appellants raised other claims not relevant to this appeal.

material leads to the absurd result that an application cannot be disturbed once it is deemed complete.

We reject appellant's challenges to the Commission's interpretation and application of section 13105, subdivision (a). Therefore, because substantial evidence supports the Commission's determination that accurate or complete information would not have caused the Commission to act differently in ruling on MVF's CDP application (§ 13105, subd. (a)), we affirm the judgment of the superior court denying administrative mandate.

## FACTUAL AND PROCEDURAL HISTORY

I. *Malibu Valley Farms* (*MVF*)

MVF owns and operates an equestrian facility in the Santa Monica Mountains near the intersection of Mulholland Highway and Stokes Canyon Road. In 1996, the facility was damaged in a fire. MVF sought to rebuild it, performing some of the work before obtaining a CDP, setting in motion the proceedings before the Commission that are at issue here.

MVF's facility and proposed development are in the coastal zone. For areas within a coastal zone, the Coastal Act requires local governments to develop LCPs, consisting of a land use plan (LUP) and implementing ordinances. (Pub. Resources Code, §§ 30108.5, 30500, subd. (a); *McAllister v. California Coastal Com.* (2008) 169 Cal.App.4th 912, 922–923.) If a local government's LCP (including the LUP) has been certified by Commission, the local agency is the permitting agency for a CDP. (Pub. Resources Code, § 30600, subd. (d).) If the LCP has

4

not been certified, the Commission is the permitting agency. (Pub. Resources Code, § 30600, subds. (a), (b) and (d).)

In this case, the applicable LUP is the Malibu-Santa Monica Mountains LUP (Malibu LUP), formulated by Los Angeles County. Under the Malibu LUP, MVF's proposed development lies within an area—the riparian canopy of Stokes Canyon Creek—designated as an inland Environmentally Sensitive Habitat Area (ESHA) protected by the Coastal Act. (Pub. Resources Code, § 30240, subd. (a).)[3] However, at the time of these proceedings, the Commission had not certified the Malibu LCP (it was not certified until October 2014). Thus, only the Commission had authority to issue a CDP to MVF. (Pub. Resources Code, § 30600, subds. (b), (c), (d); *Healing v. California Coastal Com.* (1994) 22 Cal.App.4th 1158, 1163.)

## II. *MVF's CDP Application*

After unsuccessful proceedings before the Commission regarding a request for an exemption from the Coastal Act and an earlier CDP application not here relevant, in December 2006 MVP submitted the CDP application at issue in this case, seeking after-the-fact approval of construction already performed at the site. The construction aspect of

---

[3] An ESHA is "any area in which plant or animal life or their habitats are either rare or especially valuable because of their special nature or role in an ecosystem and which could be easily disturbed or degraded by human activities and developments." (Pub. Resources Code, § 30107.5.) An ESHA is protected against "significant disruption of habitat values"; only uses dependent upon such resources are allowed. (Pub. Resources Code, § 30240, subd. (a).)

MVF's CDP application called for considerable new building. There was to be an approximately six-acre equestrian facility, composed of two riding arenas, fencing, a dirt access road with at-grade crossing of Stokes Canyon Creek, corrals, paddock, tack rooms, and barns. The project also included the removal of 32 pipe corrals, several covered corrals, storage containers, and tack rooms.

When considering whether to issue a CDP, the Commission is guided by the Coastal Act's "Chapter 3" policies, which are designed in large part to protect the ecological balance along California's coastline by assuring environmentally sensitive development. (Pub. Resources Code, § 30200, subd. (a) ["the policies of this chapter shall constitute the standards by which … the permissibility of proposed developments subject to the provisions of this division are determined"]; *Douda v. California Coastal Com.* (2008) 159 Cal.App.4th 1181, 1191.)[4] The

[4] The Chapter 3 policies are set forth in Public Resources Code section 30001.5:

"The Legislature further finds and declares that the basic goals of the state for the coastal zone are to:

"(a) Protect, maintain, and, where feasible, enhance and restore the overall quality of the coastal zone environment and its natural and artificial resources.

"(b) Assure orderly, balanced utilization and conservation of coastal zone resources taking into account the social and economic needs of the people of the state.

"(c) Maximize public access to and along the coast and maximize public recreational opportunities in the coastal zone consistent with sound resources conservation principles and constitutionally protected rights of private property owners.

"(d) Assure priority for coastal–dependent and coastal–related development over other development on the coast.

Commission may accept a CDP application for filing only "after reviewing it and finding it complete." (§ 13056, subd. (a).) Under section 13052, "[w]hen development for which a permit is required pursuant to Public Resources Code, Section 30600 or 30601 also requires a permit from one or more cities or counties or other state or local governmental agencies, a permit application shall not be accepted for filing by the Executive Director unless all such governmental agencies have granted at a minimum their preliminary approvals for said development," with exceptions not here relevant. (§ 13052; see *Kalnel Gardens, LLC v. City of Los Angeles* (2016) 3 Cal.App.5th 927, 940 [a CDP is in addition to, and separate from, the required permits issued by local agencies for any development].)

In the instant case, under the Malibu LUP, development in an ESHA was subject to review by the ERB. Such developments were to be sited and designed to prevent impacts which would significantly degrade such areas, and be compatible with the continuance of the habitat. (Malibu LUP, Policy 69.)

Besides approval by the ERB, the proposed project was subject to approval by various other local and state agencies. The only approvals submitted in the CDP application relevant to this appeal were those by the ERB, Fish and Game, and the Water Board.

---

"(e) Encourage state and local initiatives and cooperation in preparing procedures to implement coordinated planning and development for mutually beneficial uses, including educational uses, in the coastal zone." (Pub. Resources Code, § 30001.5.)

7

The ERB approval, dated January 27, 2003, did not pertain to the development for which MVF sought the CDP. Rather, it pertained to MVF's earlier unsuccessful 2003 "vested rights application," which sought a declaration that the structures to be repaired were exempt as having been in place prior to the effective date of the Coastal Act. Further, ERB's approval described MVF's request to "[r]etain facilities on an existing equestrian operation: relocate portable tack shelter; remove storage shelter, portable storage trailer," as well as removing pipe corrals. It did not refer to the full range of construction for which MVF sought a CDP. ERB found this project "consistent after modifications," and recommended that public works address the hydrological issues on the site and correct problems contributing to erosion and undercutting of structures, and adapt the lighting at the property so that it was of low intensity and shielded.

The Fish and Game approval, dated March 15, 2005 was granted by operation of law. By letter, Fish and Game notified MVF that it did not need a lake or streambed alteration agreement from Fish and Game because the department had failed to act on MVF's application within the 60 days as required by Fish and Game Code section 1602, subdivision (a)(4)(D). As a result, "from the date of this letter, by law you may go forward with your project without an Agreement from the Department." The letter further provided that "Your project must terminate no later than 5 years from the date of this letter." In its CDP application, MTV represented (incorrectly) that Fish and Game had approved the merits of the project.

The Water Board's approval was a "Notice of Intent" to comply with the terms of the general permit to discharge storm water, dated June 27, 2005. Despite MVF's representation in its CDP application, this approval was also not on the merits of the project, because in obtaining the notice of intent, MVF described the facilities currently at the site, and did not mention any new construction.

III. *Mitigation Plans*

Before issuing a CDP, the Commission must make factual findings regarding the project's consistency with the California Environmental Quality Act (CEQA) (Pub. Resources Code, §§ 21000, et. seq., 13096, subd. (a).) Although under CEQA, an environmental impact report must be prepared where a project may have a significant and adverse physical effect on the environment, this requirement does not apply to CDPs. (§ 21100, subd. (a) [preparation of environmental impact report].) Certain agencies, including the Coastal Commission, which constitutes a regulatory program, generate documents that serve as the functional equivalent of an EIR. (§ 21080.5, subd. (a); *Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 113.) In this case, the Commission's staff reports serve as the EIR. Nonetheless, CEQA precludes approval of a project if there are feasible alternatives or feasible mitigation measures available that would substantially lessen the project's adverse effects on the environment. Thus, the CDP must provide for such mitigation measures or alternatives. (See Pub. Resources Code, § 21080.5, subd. (d)(2)(A) [Commission must insure

9

that activity will not be approved or adopted if there are feasible alternatives or mitigation measure available].)

MVF's application included a "Comprehensive Management Plan" designed to minimize the environmental impact on the ESHA and riparian habitat at the site. Among other measures, MVF intended to install vegetative swales to catch runoff before it entered Stokes Canyon Creek; to create a restored riparian buffer between the facility and the creek; and to adopt a detailed manure management program.

MVF's proposed new and as-built facilities provided a 50-foot setback from the top of the bank of Stokes Canyon Creek, although the Malibu LUP required a minimum setback of 100 feet from the outer edge of the riparian tree canopy, and this setback was not to be measured from the top of the bank of the stream.

IV. *Commission Staff Report*

The Commission deemed the CDP application complete on March 21, 2007 and scheduled a July 2007 hearing.

The Commission's staff report found the project to be problematic, because: (1) the location of the proposed facilities were not use-dependent on resources present in the ESHA as required by the Coastal Act; (2) two stream crossings would significantly disrupt habitat values of Stokes Creek, in violation of the Coastal Act and the Malibu LUP; and (3) the proposed 50-foot setbacks violated the Malibu LUP, which required a minimum 100 foot setback from the ESHA. The report reviewed alternatives, and found that feasible alternatives existed, "both on-site and off-site, to accommodate low-intensity equestrian

facilities while providing at least a 100-foot setback from streams and avoiding or minimizing impacts to water quality to such a degree as to make the project consistent with the standard of Chapter 3 of the Coastal Act."

## V. *Commission Hearing*

On July 9, 2007, the Commission held a public hearing on the permit application. At the hearing, appellants argued that the application was not complete because the relevant permits had expired, and anything less than 100 feet of setback violated the Malibu LUP.

In response, MVF asserted that it had the appropriate preliminary approvals from local agencies. Among other things, MVF advised the Commission that the ERB could, on a case-by-case basis, recommend less than the required 100-foot setback, and the ERB had done so in MVF's case. MVF also asserted that Fish and Game had approved the two dirt trails (apparently the at-grade stream crossings), and that MVF had approval from the Water Board.

## VI. *Commission Findings*

At the July 9, 2007 hearing, deviating from the staff recommendation, the Commission approved the proposed project by a vote of seven to five. The findings noted that they were based in part on various other agency approvals, including the January 27, 2003 ERB

approval, the March 15, 2005 Fish and Game approval, and the June 27, 2005 Water Board approval.[5]

In approving the project, the Commission imposed several conditions. These conditions included that MVF implement its Comprehensive Management Plan, grant an agricultural easement, and grant a deed restriction concerning the coastal permit relating to the property.

Because the vote disagreed with the staff recommendation, in June 2008, the Commission issued revised findings[6] in which it found the project met the policies of Chapter 3 of the Coastal Act and the applicable policies of the Malibu LUP. The Commission adopted the stance that the drainage, streambed and setback issues could be evaluated on a case-by-case basis consistent with the Malibu LUP, and found the project, as conditioned, consistent with Public Resources Code section 30240, subdivision (a) and the ESHA protection policies of the LUP. Further, the Commission found that the Malibu LUP's 100-foot setback requirement could be evaluated on a case-by-case basis. In particular, the Commission found MVF's proposed 50-foot setback

---

[5]    The other agency approvals listed were: (1) County of Los Angeles Department of Regional Planning, Approval in Concept, February 2, 2004; (2) County of Los Angeles Fire Prevention Engineering Approval in Concept, dated June 5, 2002; (3) County of Los Angeles Preliminary Fuel Modification Plan, dated December 18, 2002; and (4) County of Los Angeles Preliminary Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Construction, dated June 27, 2005.

[6]    Revised findings are required where the Commission vote is contrary to the staff recommendation. (§ 13096, subd. (b).)

would avoid significant habitat disruption. The Commission made this finding based upon the Comprehensive Management Plan, together with conditions to be imposed.

VII. *Coastal Law Enforcement Action Network (CLEAN) Writ Petition*

In the meantime, in December 2007, before the Commission issued its June 8, 2008 revised findings, the Coastal Law Enforcement Action Network (CLEAN), which is not a party to this appeal, filed a petition for writ of mandate, contending that substantial evidence did not support the Commission's July 2007 decision, and that the Commission erroneously relied on the ERB preliminary approval to allow less than a 100-foot setback. Specifically, CLEAN contended that MVF presented the project to the ERB in 2003 as consisting of modifications to the existing facility; however, at the July 2007 Commission hearing MVF represented that the ERB had approved the entire project. Further, MVF had misinformed the Commission that the ERB had approved less than 100 feet of setback when it in fact had not. Appellants did not participate in the CLEAN writ petition.

In March 2009, the trial court ruled that substantial evidence supported the Commission's approval of MVF's permit application, except to the extent that the Commission relied on the ERB's preliminary approval as supporting evidence. The trial court issued a writ and directed the Commission to set aside its July 2007 findings and reconsider those findings by (1) relying on evidence other than the ERB approval, (2) conducting a new hearing on the scope of the ERB

13

approval, or (3) deciding to impose a less than 100-foot setback on grounds other than the ERB approval.

VIII. *Commission's July 2009 Revised Findings*

In response to the writ of mandate on the CLEAN writ petition, the Commission issued a July 2009 staff report. It determined that although the Malibu LUP generally required structures adjacent to ESHA to be set back a minimum of 100 feet from the riparian tree canopy, "the LUP provides guidance only. Because there is no fully effective, certified Local Coastal Program that is applicable,[7] the provisions of the Coastal Act control. The Coastal Act does not itself establish specific quantitative standards for buffer areas and, in the absence of binding LCP standards, allows determinations regarding buffer areas to be made on a case-by-case basis." Thus, although some of the proposed structures were as close as 10 feet from the riparian canopy, the Commission observed that most of the proposed development would be set back 50 feet from the top of the stream bank and MVF would remove existing structures that were located closest to the riparian areas, and adhere to its Comprehensive Management Plan, which had provisions to capture runoff from the farm as well as an equine waste management program. The Commission found these measures would not disrupt or degrade the habitat values of Stokes

---

[7]     As we have noted, the Malibu LUP had not yet been certified by the Commission.

14

Canyon Creek and were consistent with the ESHA protections of section 30240 of the Coastal Act.

Further, "[t]he development that is proposed to be located within the riparian corridor, as conditioned, is consistent with Section 30240(a) and the ESHA protection policies of the LUP.  Equestrian trails, including stream crossings, are resource dependent uses.  The stream crossings have been designed to minimize runoff and include drainage control features.  Although the LUP calls for stream crossings to be accomplished by bridges, it does allow the ERB to allow exceptions.  Here, the ERB approved the crossings, finding that they were consistent with the LUP's resource protection policies. . . .  The Commission finds that with these features and implementation of the Malibu Valley Farms Comprehensive Management Plan, as required by Special Condition No. 1, the proposed development is a resource-dependent use and that it avoids significant disruption of habitat values."

At the public hearing on the findings, the Commission heard comment from CLEAN, appellants, and MVF.  Appellants argued that MVF's application lacked the required preliminary approvals and that MVF misrepresented the scope of those approvals.  A member of the ERB submitted a declaration stating that she had visited the MVF site in 2003 in connection with MVF's vested rights application and thus the ERB review in this case was limited to the proposed modifications to the site.  At that time, the ERB did not review or comment on existing structures, some of which were located within the 100-foot setback from Stokes Canyon Creek.

The Commission adopted the revised findings by a vote of six to one, and granted the CDP.

IX.  *Appellants' Revocation Request*

On December 8, 2008, appellants filed a request for revocation of MVF's CDP.  They focused on what they termed "project switching," contending that because the ERB approval was obtained in  connection with MVF's 2003 vested rights application, the ERB approval did not encompass the changes to the property envisioned by the CDP and hence could not support the CDP.  They asserted that the ERB approval did not address the current CDP, which included the replacement structures, the two at-grade stream crossings, or livestock fencing. Appellants reiterated that MVF represented to the Commission at the 2007 hearing that the necessary approvals had been obtained.  In particular, regarding the 100-foot setback required by the Malibu LUP, MVF had told the commission (incorrectly) that the ERB could, on a case-by-case basis, recommend a reduced setback, and that the ERB had done so.

On October 5, 2009, appellants filed an amended request relating to the Commission's July 2009 findings.  Appellants  challenged MVF's representations regarding the agricultural easement, and unpermitted development that was allegedly not approved or mitigated.

X.  *Commission's Ruling*

The Commission found various intentional misrepresentations concerning the approvals submitted by MVF from the ERB, Fish and

Game, and Water Board in the CDP application. However, it denied appellants' revocation request, finding under section 13105, subdivision (a), that accurate information about the approvals would not have caused the Commission to require different or additional conditions, or to deny MVF's CDP application. The Commission rejected appellants' argument that the incomplete and inaccurate permits mandated revocation. The Commission found that "the absence of other approvals does not preclude the Commission from processing a permit application, and the lack of, or need for, additional permits or other jurisdictional reviews is not a ground for revocation under the Coastal Act." Specifically, the Commission found that (1) the incomplete approvals could have formed the basis for objecting to the filing of the CDP application, but once the application was filed, the Commission was not precluded from acting on the application; (2) the standard of review for the permissibility of the project covered by the challenged CDP was whether the project was consistent with the Coastal Act's Chapter 3 policies; and (3) "Regardless of whether a CDP was approved by the Commission, the subject CDP does not eliminate, or materially affect, any other requirements by other agencies for the same development. Thus, the Commission's action in no way undermined the jurisdiction of these other agencies. And while . . . the Commission does sometimes include a condition requiring an applicant to secure all other necessary approvals before the Commission's permit will issue, it is not required to do so, and would not necessarily have done so here even if it had been aware of the status of those other approvals."

With respect to the three approvals in issue in this appeal, the Commission reasoned as follows.

A. *The ERB Approval*

Appellant's argued that the application mischaracterized the ERB review as approval for the entire project, not just the previously filed vested rights application. A member of ERB submitted a statement in which she asserted that she attended the meeting at which the ERB's 2003 review of MVF took place in connection with its vested rights application. She recalled that the ERB's review of the site was limited to those structures not part of the vested rights claim as only the Commission could approve a vested rights claim. Thus, their review was limited to proposed changes, and they could not consider structures already built. However, some of these buildings were located within the 100-foot setback but the ERB made no findings with respect to these buildings.

The Commission found sufficient evidence in the record to approve the CDP without relying on the ERB: "[T]he correct information would not have made a difference because the Revised Findings, dated June 25, 2009, specifically considered this issue and made separate findings with regard to the creek setback under its own authority without relying on the ERB decision. The Commission made findings, irrespective of the action of the ERB, that the project would not have adverse impacts on coastal resources. The Commission specifically considered and found that a 50-foot buffer would be adequate in these unique circumstances. In the findings, the Commission found ample

18

support for its approval in the evidence in the record without the need to rely on the ERB approval. Therefore, accurate information would not have changed, and in fact did not change, the Commission's action to approve the project with conditions."

B. *Fish and Game Approval*

Appellants contended that MVF represented to the Commission that Fish and Game's approval was on the merits, rather than merely correspondence stating that an approval was not necessary because the agency failed to meet the statutory deadline; further, MVF did not seek approval of the two at-grade crossings of the creek.

The Commission found sufficient evidence in the record to approve the CDP without relying on the Fish and Game approval: "Preliminary approvals from other regulatory bodies are not a standard of review under the Chapter 3 policies of the Coastal Act." The Commission would not have made a different decision, either denying the project or adding conditions, because the Commission found the project consistent with the policies of Chapter 3 of the Coastal Act.

C. *Water Board Approval*

Appellants argued this approval was limited to storm water runoff and did not cover the entire site. The Commission found sufficient evidence in the record to approve the CDP without relying on the Water Board's approval because the scope of the Water Board's approval would not have caused the Commission to make a different decision, either denying the application or imposing conditions.

XI.   *Appellants' Petition for Writ of Administrative Mandamus*

On August 15, 2011, appellants filed a petition for administrative mandate in the superior court, seeking an order setting aside the Commission's denial of their revocation request.[8]  The trial court denied the petition, concluding that "although there is substantial evidence in the record that MVF made intentionally inaccurate or incomplete statements about these approvals at the July 2007 hearing at which the Commission approved the permit, there is also substantial evidence in the record that [under section 13105, subdivision (a)] the outcome would have been the same because the misrepresented information had no impact on the Commission's finding of consistency with Chapter 3 policies.  Petitioners have failed to demonstrate that accurate and complete information would have caused the Commission to require additional or different conditions, or deny MVF's application, as required for permit revocation pursuant to 14 CCR section 13105(a)."  Appellants appeal from the order denying administrative mandate.

---

[8]    Public Resources Code section 30801 gives an "aggrieved person," defined as anyone who appears at a public hearing of the Commission, the right to judicial review of a Commission decision by a writ of administrative mandamus.  (Pub. Resources Code, § 30801; *Hagopian v. State of California* (2014) 223 Cal.App.4th 349, 359 (*Hagopian*).)  Hubbard is an individual who is an "aggrieved person" within the meaning of section 30801, who has the right to judicial review of Commission action by writ of administrative mandamus.  (*Hagopian, supra,* 223 Cal.App.4th at p. 359.)  SOS is a California nonprofit public benefit corporation and consists primarily of residents who live in the Santa Monica mountains.

# DISCUSSION

On appeal, appellants contend that the Commission erred in interpreting section 13105, subdivision (a), and applying it to the facts of this case. They raise three main arguments.

First, they contend that the plain meaning of section 13105, subdivision (a), and the interplay of that language with the language of section 13052, requires the conclusion that a CDP is invalid unless the application contained complete and accurate information of local and state approvals. Second, they contend that the legislative intent behind sections 13052 and 13105 indicates that a CDP applicant cannot benefit from its failure to comply with the local agency approval procedural requirements. Third, they contend that the Commission's interpretation leads to the absurd result that an application cannot be disturbed once it is deemed complete. As we explain, we disagree with these contentions.

## I. *Standards of Review*

The standard of review in administrative mandate proceedings is well-settled: whether the agency acted without or in excess of jurisdiction, whether there was a fair hearing, and whether there was a prejudicial abuse of discretion. An abuse of discretion occurs when the agency did not proceed in the manner required by law, its order or decision is not supported by the findings, or the findings are not supported by the evidence. (Code Civ. Proc., § 1094.5, subd. (b).)

We review the administrative record to determine whether the Agency's findings are supported by substantial evidence. (*Reddell v.*

*California Coastal Com.* (2009) 180 Cal.App.4th 956, 962.) To the extent interpretation of a statute is involved, we exercise independent review and apply the well-settled rules of statutory construction. (*Automotive Funding Group, Inc. v. Garamendi* (2003) 114 Cal.App.4th 846, 851.) We do not defer to an agency's determination when deciding whether the agency's action lies within the scope of its authority delegated to it by the legislature. (*Citizens for a Better Eureka v. California Coastal Com.* (2011) 196 Cal.App.4th 1577, 1583.)

The rules of statutory construction, which are equally applicable to administrative regulations, are also well-settled. The fundamental rule is to ascertain the Legislature's intent in order to give effect to the purpose of the law. (*Pasadena Metro Blue Line Construction Authority v. Pacific Bell Telephone Co.* (2006) 140 Cal.App.4th 658, 663–664 (*Pasadena Metro Blue Line*).) We first examine the words of the statute and try to give effect to the usual, ordinary import of the language while not rendering any language surplusage. These words must be construed in context and in light of the statute's obvious nature and purpose, and must be given a reasonable and commonsense interpretation that is consistent with the Legislature's apparent purpose and intention. (*Id.* at p. 664.) Our interpretation should be practical, not technical, and should also result in wise policy, not mischief or absurdity. (*Ibid*.) We do not interpret statutes in isolation. Instead, we read every statute with reference to the entire scheme of law of which it is a part in order to harmonize the whole. (*20th Century Ins. Co. v. Superior Court* (2001) 90 Cal.App.4th 1247, 1275.) If the

22

statutory language is clear, we should not change it to accomplish a purpose that does not appear on the face of the statute or from its legislative history. (*Pasadena Metro Blue Line, supra,* 140 Cal.App.4th at p. 664.) If, however, there is more than one reasonable interpretation of a statute, then it is ambiguous. (*Joannou v. City of Rancho Palos Verdes* (2013) 219 Cal.App.4th 746, 752.) If so, we turn to secondary rules of construction, including maxims of construction, the legislative history, and the wider historical circumstances of a statute's enactment. (*Ibid.*) We may look to the ostensible objects to be achieved, the evils to be remedied, public policy, and contemporaneous administrative construction. (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 803 (*Pacific Palisades Bowl*).)

II.    *Plain Meaning*

In the instant case, section 13105, subdivision (a), provides grounds for revoking a CDP based on misinformation in the application. It states that a permit may be revoked for "[i]ntentional inclusion of inaccurate, erroneous or incomplete information in connection with a coastal development permit application, where the commission finds that accurate and complete information would have caused the commission to require additional or different conditions on a permit or deny an application." (§ 13105, subd. (a).) The meaning of this language is clear:  only material omissions or misrepresentations in a CDP application warrant revocation. If accurate and complete

23

information would not have caused the Commission to have acted differently, the CDP stands.  Moreover, section 13105, subdivision (a) does not limit the type or content of the misrepresentations to which it applies.  It covers all intentionally "inaccurate, erroneous or incomplete information," necessarily including information regarding approvals by other local and state agencies.

Contrary to appellant's argument, viewing section 13105 in light of section 13052 does not change this interpretation.  Section 13052 provides in relevant part that "[w]hen development for which a permit is required pursuant to [the Coastal Act] also requires a permit from one or more cities or counties or other state or local governmental agencies, a permit application shall not be accepted for filing by the Executive Director unless all such governmental agencies have granted at a minimum their preliminary approvals for said development."  That under section 13052 a CDP application shall not to be accepted for filing without necessary state or local government approvals says nothing about what happens when (as in the instant case) an application *is* accepted for filing with misrepresentations regarding such approvals, and a CDP is issued.  That eventuality is governed by section 13105, subdivision (a):  the CDP can be revoked only if the misrepresentations are intentional and material.

III.  *Ambiguity*

Even if the language of section 13052 created some ambiguity whether section 13105 applied to misrepresentations about permits issued by other local and state agencies, secondary rules of construction

24

would not change our reading of section 13105. The Commission's comments in adopting section 13105[9] make clear that "[t]his article governs proceedings for the revocation of a permit previously granted by the Commission. . . . With authority to grant a permit goes the authority to revoke a permit. . . . The Commission's decisions should be based upon accurate and complete information provided by the applicant and with knowledge of the views of persons reasonably expected to participate. The applicant should not be permitted to benefit by failing to comply with the Commission's procedures. *The applicant should, however, be able to rely on a permit issued by the Commission. Therefore, the grounds for revocation are not merely lack of compliance with the procedures but when the decision of the Commission would have been different had the information been present.*" (Italics added.) Thus, the Commission considered the need for accurate information in a CDP application against the need for an applicant to rely on a CDP that is issued, and reached a reasonable balance: grounds for revocation exist only if the Commission's decision would have been different if the correct information had been provided. Appellants' protestations to the contrary notwithstanding, the Commission's balance of interests in determining when a CDP can be set aside for misrepresentations can hardly be described as absurd.

Moreover, the Commission's comments in adopting section 13052 reflect that the reason for including state and local agency permits in

---

[9]    We granted appellants' request for judicial notice of the Commission's Rule Making comments concerning sections 13052, 13053, and 13105.

the CDP application is that "[e]ach approval relates to an area of concern to the Commission under the policies of Chapter 3 of the Coastal Act and the required finding that the permitted development will not prejudice the ability of the local government to prepare a local coastal program that is consistent with the provisions of Chapter 3." Nothing in the comments suggest that inaccurate information in the application concerning state and local agency approvals deprives the Commission of the authority to issue a CDP. Indeed, under Public Resources Code section 30200, subdivision (a), the policies of Chapter 3 are the standards by which proposed developments are evaluated. Since the purpose of section 13052 is to ensure that the project is consistent with the policies of Chapter 3, it makes sense that revocation of a CDP under section 13105 will occur only if the Commission would have acted differently if it had received accurate information about local and state agency permits. In other words, the Commission must consider whether, despite the inaccuracies in violation of section 13052, the project nonetheless meets the Chapter 3 policies. If so, then the issuance of the CDP, even based on inaccurate information regarding local or state agency approvals, remains consistent with the Coastal Act, and need not be revoked under section 13105.

Further, we note that our interpretation of section 13105 is consistent with relationship between the Commission and other local and state permitting agencies under the Coastal Act. The Coastal Act relies heavily on local governments to ensure "maximum responsiveness to local conditions, accountability, and public accessibility." (Pub. Resources Code, § 30004, subd. (a).) It recognizes this relationship in

26

two ways: first, by requiring local agency permits to be at least preliminary at the time of a CDP application (§ 13052),[10] and second, by requiring local governments to develop LCPs, which if certified, become the permitting authority in the place of the Commission (Pub. Resources Code, §§ 30500-30526). Under this scheme, a Coastal Act CDP acts in tandem with local agency permits. The local agencies never lose their jurisdiction over the project or development at issue simply because a CDP is required. (*Pacific Palisades Bowl, supra,* 55 Cal.4th at p. 794 [CDP is in addition to local agency permits].)

But in a case such as this, in which there is no certified LCP, authority to issue a CDP remains with the Commission, and the standards of permissibility are those of the Coastal Act itself. Nothing in the Coastal Act or applicable regulations suggests that a CDP issued by the Commission is per se invalid simply because the application contained intentional misrepresentations about whether local or state agencies had approved the project. So long as the project, despite the misrepresentations, remains consistent with Chapter 3 policies, the CDP remains valid. (See *McAllister v. County of Monterey* (2007) 147 Cal.App.4th 253, 273 ["The Coastal Act's chapter 3 policies constitute the general standards for judging the permissibility of specific developments within the coastal zone"].) Thus, when the Commission is the permitting authority, local agency permits are contemplated as an integral part of the CDP process, and remain a requirement for

---

[10] Arguably, the inclusion of the materiality component in section 13105 evidences the recognition that the permitting procedure is an ongoing process.

27

development.  But none of the provisions of the Coastal Act suggest that, in the fundamental jurisdictional sense, the Commission lacks authority to issue a CDP unless it contains entirely complete and accurate information concerning the required local permits.  Nor does it suggest that there are any grounds for revocation of a CDP in that circumstance other than the required showing under section 13105:  a showing of intentional misrepresentations, such that had accurate information been provided, the Commission would have imposed additional conditions or denied the CDP.

IV.   *Substantial Evidence*

Finally, to the extent that appellants argue that the Commission's findings were not supported by substantial evidence, we disagree. MVF's Comprehensive Management Plan set forth numerous measures that would be taken to ensure protection of the coastal zone on subjects covered by permits to be issued by the ERB, Fish and Game, and the Water Board, including the riparian setback, resource-dependent uses, and at-grade stream crossings.  As the Commission observed, because there was no LCP, the Coastal Act controlled permissible development at MVF, and the Coastal Act does not establish specific quantitative standards for buffer areas or set-backs.  In the absence of binding LCP standards, the Coastal Act allows determinations regarding buffer areas to be made on a case-by-case basis.  Although some of the proposed structures were as close as 10 feet from the riparian canopy, most of the proposed development would be set back 50 feet from the top of the stream bank.  Also, MVF would remove existing structures

that were located closest to the riparian areas, and adhere to its Comprehensive Management Plan, which had provisions to capture runoff from the farm as well as an equine waste management program. Nothing in the record indicates these measures would disrupt or degrade the habitat values of Stokes Canyon Creek.

Further, equestrian trails, including the at-grade stream crossings, were resource dependent uses in an ESHA. Although the Malibu LUP called for stream crossings to be accomplished by bridges, it allowed for exceptions. The Comprehensive Management Program, prepared at the Commission's request, designed the stream crossings to minimize runoff and include drainage control features.

In short, the Commission correctly interpreted and applied section 13105, subdivision (a). Further, substantial evidence supports the Commission's determination that although MVF's application contained intentional misrepresentations regarding the approvals by the ERB, Fish and Game, and the Water Board, the Commission would not have imposed additional conditions or denied the CDP if accurate information had been provided. Thus, there were no grounds to revoke the CDP.

//

//

//

//

//

29

## DISPOSITION

The judgment of the Superior Court is affirmed.  Respondent is to recover its costs on appeal.

**CERTIFIED FOR PUBLICATION**

WILLHITE, Acting P. J.

We concur:

COLLINS, J.

CURREY, J.