Filed 9/10/21  L.A. County Metro. Transportation Auth. v. So. Cal. Gas Co. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
## SECOND APPELLATE DISTRICT
## DIVISION FOUR

| | |
|---|---|
| LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION AUTHORITY, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> SOUTHERN CALIFORNIA GAS COMPANY, <br><br> Defendant and Respondent. | B288686 <br> (Los Angeles County <br> Super. Ct. No. BC658988) <br><br> ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING <br><br> NO CHANGE IN JUDGMENT |

THE COURT\*:

The opinion filed August 13, 2021, in the above-entitled matter is ordered MODIFIED as follows:

1. On page 38, the second full paragraph is modified to strike the three sentences at lines eight through 11 beginning with the sentence "Further, Metro's argument treats its ROW as a fee simple."

2. On page 38, the second full paragraph is modified at line 11 to insert the sentence "Metro stipulated that its ROW were formerly held by ATSF."

3.      On pages 38 and 39, the last sentence of the second full paragraph starting on page 38 and continuing to page 39 is deleted.

4.      On page 6, the second full paragraph is modified to delete the words "an annual nominal" and replace them with "a one-time."

5.      The number "30361" is changed to "30631" at the following locations:  page 11, the last line; page 21, the first line of footnote 9; page 24, the last line of heading 3; page 25, the first line of the first full paragraph and the fifth line of the first full paragraph; page 27, the second line of footnote 11; and page 32, the fifth line of the first full paragraph.

These modifications do not change the judgment.
The request for publication is DENIED.
The petition for rehearing is DENIED.

_____

MANELLA, P.J.        COLLINS, J.        CURREY, J.

Filed 8/13/21  L.A. County Metro. Transportation Auth. v. So. Cal. Gas Co. CA2/4
(unmodified opinion)

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION AUTHORITY, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> SOUTHERN CALIFORNIA GAS COMPANY, <br><br> Defendant and Respondent. | B288686 <br><br> (Los Angeles County Super. Ct. No. BC658988) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Richard E. Rico, Judge. Affirmed.

Miller Barondess, Louis R. Miller and Mira Hashmill and Office of the County Counsel, Mary C. Wickham, Charles M. Safer, Kathleen Dougherty for Plaintiff and Appellant.

Gibson, Dunn & Crutcher, David A. Battaglia, Jennifer K. Bracht for Defendant and Respondent.

Best, Best & Kriegler, Scott W. Ditfurth, Thomas M. O'Connell for Amicus Curiae Riverside County Transportation Commission.

Hanson Bridgett, Adam W. Hofmann, Josephine M. Petrick, David C. Casarrubias for Amici Curiae Southern California Regional Rail Authority, Peninsula Corridor Joint Powers Board, San Bernardino County Transportation Authority, North County Transit District, Ventura County Transportation Commission.

_____

Los Angeles County Metropolitan Transportation Authority (Metro) and Southern California Gas Company (SoCalGas) dispute which of them must pay SoCalGas's pipeline relocation costs occasioned by Metro's 2013 construction of the LAX/Crenshaw line. Metro asserts that licenses permitting SoCalGas to maintain natural gas pipelines on Metro's right of way (ROW) obligate SoCalGas to pay for relocation of pipelines located under two streets that intersect the ROW in the City of Inglewood. SoCalGas counters that Public Utilities Code section 30631[1] obligates Metro to bear the expense.

This appeal presents two related issues: (1) Whether Metro must reimburse SoCalGas under section 30631, or whether the licenses control; and (2) whether SoCalGas is trespassing on Metro's ROW. According to the parties, we must sort through many different and potentially conflicting sources of law to answer these questions, including: section 30631; the parties' Utility Cooperative Agreement and an amended version of that

---

[1]     All statutory references are to the Public Utilities Code unless otherwise noted.

2

agreement; licenses between Metro and SoCalGas; easements; and franchise agreements with the City of Inglewood.

In a written ruling, the trial court held that Metro is required to reimburse SoCalGas, and that SoCalGas is not in trespass on Metro's ROW. It entered summary judgment in favor of SoCalGas. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### 1. *The Parties.*

#### *(a) Metro.*

The Legislature created Metro in 1993. Metro is the combined successor to both the Southern California Rapid Transit District (SCRTD) and the Los Angeles County Transportation Commission (LACTC). (§ 130050.2.) Metro is a public agency and a public corporation. It can make contracts, acquire rights of way, construct rail lines, incur bonded indebtedness, exercise eminent domain, and levy and collect taxes. (See, e.g., §§ 30005, 30503, 30530, 30700, 30900, 30930.)

#### *(b) SoCalGas.*

SoCalGas is an investor-owned public utility providing natural gas to over 21 million customers in Southern California. It is regulated by the California Public Utilities Commission.

### 2. *Construction of the LAX/Crenshaw Line.*

Metro is responsible for the construction and operation of commuter rail lines in Los Angeles County, including the Gold (L), Blue (A), Red (B), Green (C), and Expo (E) lines.

To build these and future transit rail lines, Metro in some cases acquired former ROW from private railroad companies. In

October 1992, Metro purchased the "Harbor Subdivision" (a railway corridor) from the Atchison, Topeka and Santa Fe Railway (ATSF) pursuant to a Grant Deed and Purchase Agreement dated June 30, 1993. The Grant Deed provided that Metro obtained its railway property from ATSF "subject only to the following permitted exceptions[.]" One of the exceptions provided that Metro took the property "subject to all applicable laws, rules, regulations or orders of any municipality or other governmental, statutory or public authority[.]"

In 2013, Metro commenced construction of the 8.5 mile LAX/Crenshaw line, which extends from the intersection of Crenshaw and Exposition Boulevards to LAX, and is located on portions of the Harbor Subdivision. The route crosses many streets, including Arbor Vitae Street and Redondo Boulevard in the City of Inglewood. In 2015, Metro informed SoCalGas that its pipelines underneath Arbor Vitae Street and Redondo Boulevard—where those streets intersected with Metro's new route—conflicted with construction of the LAX/Crenshaw line and must be relocated.

SoCalGas objected to paying the costs of relocating its pipelines. Metro refused to reimburse SoCalGas or accept responsibility for SoCalGas's relocation costs. It did agree, however, to pay for relocation, subject to a reservation of rights, pending resolution of the dispute over relocation costs. Thereafter, SoCalGas relocated its pipelines.

The total cost to SoCalGas to relocate its pipelines at the Redondo ROW was approximately $620,000 and the estimated cost at the Arbor Vitae ROW was approximately $500,000.

4

### 3.    *Section 30631 and Utility Relocation.*

In 1964, the Legislature enacted the Southern California Rapid Transit District Law. (Sen. Bill No. 41 (1964 1st Ex. Sess, § 1.).) The current version of section 30631, subdivision (a) gives Metro the right to acquire property interests, including rights of way. Section 30631, subdivision (b) requires Metro to reimburse the owner for actual relocation costs if pipelines beneath streets are required to be relocated because of Metro's projects.

Subdivision (b) of section 30631 provides, "[t]he use of the streets, highways, freeways, and other public places by [Metro] for any of the purposes permitted herein is presumed to be no greater burden on adjoining properties than the uses existing as of August 22, 1964. If facilities, other than state highways or freeways referred to above, (including, but not limited to, streets, highways, pipelines, sewers, water mains, storm drains, poles, communications wires, and electric transmission wires) of another public agency, of the state, or of a private owner are necessarily required to be relocated, replaced, or altered in order for [Metro] to construct or operate its system, or if the construction or operation by [Metro] of its system makes necessary the relocation, replacement, or alteration of any of those facilities of another public agency, of the state, or of a private owner in order to maintain the functioning of the facilities at their previous level of service, the facilities shall be relocated, replaced, or altered with reasonable promptness by the respective public corporation, state, or private owner and [Metro] shall, by prior agreement, reimburse the public corporation, state, or private owner for the actual cost necessarily incurred in the relocation, replacement, or alteration."

In the past, when Metro or its predecessors engaged in construction projects requiring the relocation of SoCalGas's pipelines, Metro routinely reimbursed SoCalGas's costs. (See *Pasadena Metro Blue Line Construction Authority v. Pacific Bell Telephone Co.* (2006) 140 Cal.App.4th 658, 662 (*Pasadena Metro*) [previously, Metro routinely agreed to pay costs of utility relocations].)

### 4.     The ROW at Arbor Vitae Street and Redondo Boulevard.

The Arbor Vitae/ROW intersection and the Redondo/ROW[2] intersection are subject to the following property interests:

#### (a)     ATSF Pipeline Licenses.

Prior to Metro's involvement, ATSF granted pipeline licenses to SoCalGas permitting it to use ATSF's right of way at Arbor Vitae Street for an annual nominal fee. The licenses were issued in 1975, 1965, and 1952 for various pipelines at the Arbor Vitae intersection. They provided that they were given "upon the express condition that the same may be terminated at any time by either party upon ten (10) days' notice in writing to be served upon the other party, stating therein the date that such termination shall take place, and that upon the termination of this license in this or any other manner herein provided, Licensee, upon demand of Licensor, shall abandon use of the PIPE LINE and remove the same and restore the right of way and tracks of Licensor to the same condition in which they were

---

2     The City of Inglewood vacated the street crossing at Redondo. As a result, the original intersection no longer exists and is now entirely devoted to railroad use.

6

prior to the placing of the PIPE LINE thereunder. In case Licensee shall fail to restore Licensor's premises as aforesaid within ten (10) days after the effective date of termination, Licensor may proceed with such work at the expense of Licensee."[3] These licenses were assigned to Metro as part of its purchase of the ROW.

On August 28, 2015, Metro informed SoCalGas that its pipeline in the Redondo intersection, for which there was no license, conflicted with the LAX/Crenshaw construction and must be relocated. From November 2015 to February 2016, Metro terminated the licenses with respect to the Arbor Vitae intersection and notified SoCalGas that its pipelines conflicted with the LAX/Crenshaw construction and must be relocated. Metro rejected SoCalGas's claim for relocation costs.

After receiving no response from SoCalGas regarding the termination notices, on February 2, 2016, Metro advised SoCalGas that "[a]t this point, Metro requests the immediate removal of these facilities [at Arbor Vitae] from within Metro's [ROW] in accordance with the attached Termination Notices. Please be aware that [SoCalGas's] failure to timely respond to the Notices of Termination is in direct violation of the terms of the License Agreements . . . ." SoCalGas responded that where it had existing facilities installed in the public ROW with no license, i.e., the Redondo/ROW intersection, Metro was responsible to reimburse it under section 30631. Where there was a license, i.e., the Arbor Vitae/ROW intersection, the Metro licenses were unenforceable for the areas within the public street where SoCalGas had franchises.

---

3       The parties agree no licenses could be found that applied to the Redondo Boulevard intersection.

### *(b)      Street Easements.*

In 1949, ATSF granted the City of Inglewood an easement with respect to public streets across the ROW at Arbor Vitae Street between Portal Avenue and Aviation Boulevard. In 1950, ATSF granted an easement to extend Redondo Boulevard across the ROW near Florence Avenue. The easements provide that Metro's predecessor ATSF could, at any time, construct railroad tracks on and use the easements, and such use was "without liability to [Inglewood] or to any one else for compensation or damage . . . ."

### *(c)      Franchises.*

SoCalGas holds several franchises permitting it to use Inglewood city streets for its pipelines pursuant to the Franchise Act of 1937. The Franchise Act authorized cities and counties to grant "the right to use, or lay and use, gas pipes and appurtenances for the purpose of . . . distributing gas . . . for all purposes, under, along, across, or upon public streets, ways, alleys and places as they now or hereafter exist within the municipality." (§ 6265.) "[F]ranchises have been created when a governmental agency authorizes private companies to set up their infrastructures on public property in order to provide public utilities to the public; i.e., when railroad, gas, water, telephone, or electric companies set up tracks, pipes, poles, etc. across the streets and other public ways of a city. [Citations.]" (*Saathoff v. City of San Diego* (1995) 35 Cal.App.4th 697, 703-704.) Under franchise agreements with Inglewood, SoCalGas has placed its pipelines in the streets in exchange for franchise fees.

### 5. *Utility Cooperative Agreement.*

In 1984, Metro's predecessor SCRTD entered into a Utility Cooperative Agreement (UCA) with SoCalGas to regulate the design and construction of SoCalGas facilities in exchange for SCRTD's payment of relocation costs. With respect to reimbursement, Article 8 of the UCA provides that Metro will reimburse SoCalGas for any work required by Metro's rearrangement of SoCalGas's facilities.[4] The UCA also provided that if SoCalGas moved its facilities on account of Metro's rearrangement, Metro would grant SoCalGas a replacement license at no cost to SoCalGas.[5]

An amendment to the UCA (Amended UCA) made in May 2005 between Metro (as SCRTD's successor) and SoCalGas left section 8.1 of the original UCA intact, stating that "[t]his Amendment shall not negate or modify the terms and conditions of" the original UCA. It also reaffirmed the SoCalGas/ATSF licenses.

---

4    Paragraph 8.1 of the UCA provides in relevant part: "The issuance of a Work Order shall obligate [Metro] to reimburse [SoCalGas] for any activity or work performed or materials acquired for each Rearrangement, in accordance with the terms of this Agreement; and such reimbursement shall be for the actual direct costs and indirect costs incurred by [SoCalGas] for such activities or work performed or materials acquired under the terms of this agreement . . . ."

5    Paragraph 4.3 provides that if a rearrangement required the siting of a utility facility in Metro's ROW, "[Metro] shall grant to [SoCalGas] [a] replacement utility easement to accommodate such Replacement Facility. Such replacement utility easement shall be granted at no cost to [SoCalGas]."

### 6. Metro's Complaint and SoCalGas's Cross-Complaint.

Metro's complaint, filed April 25, 2017, asserted claims for (1) declaratory relief, (2) specific performance of license, (3) breach of license, (4) contractual indemnity, (5) trespass, and (6) unjust enrichment. Metro principally sought a declaration that the licenses governed SoCalGas's rights and obligations with respect to its pipelines in the ROW, and pursuant to those licenses, SoCalGas was required to move its pipelines at its own expense. Metro asserted that SoCalGas's pipelines were in trespass, and sought an injunction enjoining SoCalGas from occupying Metro's ROW.

SoCalGas's cross-complaint, filed June 9, 2017, asserted claims for (1) declaratory relief, (2) reimbursement of utility relocation costs under section 30631 at both disputed intersections, and (3) breach of contract. SoCalGas sought reimbursement for its costs of relocation and a declaration that it had independent property rights in the public streets, it did not require Metro's consent to place its pipelines, and these rights were not circumscribed by the licenses.

### 7. Cross-Motions for Summary Judgment.

The parties filed cross-motions for summary judgment on stipulated undisputed facts. Metro principally argued that (1) SoCalGas was trespassing and the licenses mandated SoCalGas pay for its own relocation costs; (2) the city franchises did not give SoCalGas the right to use Metro's ROW where they intersected Inglewood's city streets; and (3) section 30631 did not govern because (a) its payment provision did not apply to private ROWs, (b) under the UCA, the parties agreed the licenses

governed, (c) SoCalGas's argument was precluded by state and federal contract clauses, and (d) *Pasadena Metro* did not support SoCalGas's arguments.

SoCalGas's motion argued that (1) section 30631, the UCA, and the common law mandated payment of its relocation costs by Metro; and (2) no claim of trespass could be stated because a property holder must yield to the use of the public streets by a utility, the cities and counties granted SoCalGas the right to construct and maintain its pipelines in the public streets, and Metro obtained its property rights from ATSF in the Grant Deed which provided its interest was subject to all state laws, including section 30631.

### 8.    *Trial Court Ruling.*

The trial court granted summary judgment in favor of SoCalGas, finding Metro obligated to reimburse SoCalGas's relocation costs based upon the court's reading of section 30631, and the policies set forth in *Pasadena Metro,* and the UCA. First, the trial court rejected Metro's contention that section 30631 applied only to public streets and did not apply to its ROW, which Metro characterized as a private property interest. Rather, "[t]he plain meaning of [section 30631, subdivision (b)] requires Metro's reimbursement without qualification based on public streets or private real property ownership. . . . Metro fails to explain how Metro's specific land ownership or property interest alters the public policy considerations or basic fairness that the statute seeks to impose. . . . But for Metro's construction, there would be no need to relocate the pipelines." In other words, as the party altering the status quo, Metro should bear the financial burden of relocating utilities. The trial court observed that although

11

*Pasadena Metro* did not address the specific question of liability for relocation costs, *Pasadena Metro's* policy guidance favored the trial court's interpretation: section 30361 required Metro to pay for utility relocation because "a new and additional burden on such facilities [was] created" by Metro's new rail project. (*Pasadena Metro, supra,* 140 Cal.App.4th at p. 665.) The trial court further found that "Metro fails to identify a compelling reason to place the burden back on the utility company and neither is one apparent within the statute."

Second, the trial court found "no doubt" that the original UCA dating from 1984 required Metro to pay relocation expenses under sections 4.1 and 8.1. "Metro has reaffirmed the [UCA] through multiple amendments. Although other terms were amended, the reimbursement provisions have never been modified since 1984 ([Stipulated Fact] 47)." The trial court rejected Metro's claims that the ATSF licenses' payment provisions trumped the UCA: "Metro fails to articulate how the ATSF licenses undermine the specific obligations under the [UCA]. Metro remains subject to [section] 30631 and Metro's procurement of property rights from ATSF does not alter the analysis. Indeed, the ATSF licenses do not mention relocating pipelines in any manner and the ATSF Grant Deed confirms that Metro takes *subject* to "all applicable laws, rules, regulations or orders of any municipality or other governmental, statutory or public agency. ([Stipulated Fact] 21)[.]"

In so holding, the trial court rejected Metro's trespass claim. Relying on *Bello v. ABA Energy Corp* (2004) 121 Cal.App.4th 301 (*Bello*), which adopted a broad view of the uses of public rights-of-way and construed them "to accommodate technological advancement in the conveyance of goods and

12

people" (*id.* at p. 314), the trial court noted that "*Bello* makes clear that the public's right in municipal streets exist as a matter of common law and are not dependent on specific language of creation."

## DISCUSSION

Metro principally argues that (1) section 30631 by its terms does not apply to Metro's ROW because section 30631 expressly addresses only public streets; (2) the ATSF licenses, as well as the amended UCA, which confirmed the licenses, require SoCalGas to pay its relocation costs; and (3) *Bello* does not deny Metro a remedy for SoCalGas's trespass. SoCalGas argues that section 30631, the UCA, and the common law require Metro to reimburse it for the relocation of its pipelines, and that Metro's property interests must yield to public utilities. Amici[6] argue the licenses mandate payment; the trial court's ruling will impair transportation agencies' ability to control costs, manage their budgets, and ensure safety; and the trial court's reading of *Bello* results in the grant of a prescriptive easement to SoCalGas. We agree with SoCalGas, and affirm.

## I.   STANDARD OF REVIEW

"[T]he party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact

---

6      Riverside County Transportation Commission (Riverside County), Southern California Regional Rail Authority, Peninsula Corridor Joint Powers Board, San Bernardino County Transportation Authority, North County Transit, and Ventura County Transportation Commission (collectively, "Rail Transit") filed amicus briefs in this case in support of Metro.

and that [they] are entitled to judgment as a matter of law."
(*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, fn.
omitted.) Where, as here, the factual issues are not subject to
reasonable dispute, we review legal issues de novo on a grant of
summary judgment. (*Husman v. Toyota Motor Credit Co.* (2017)
12 Cal.App.5th 1168, 1179; *Yu v. Liberty Surplus Corp.* (2018) 30
Cal.App.5th 1024, 1030.) "We affirm the trial court's decision if it
is correct on any ground [that] the parties had an adequate
opportunity to address in the trial court, regardless of the
reasons the trial court gave. [Citations.]" (*Jameson v. Pacific Gas
& Electric* (2017) 16 Cal.App.5th 901, 909.)

## II. METRO MUST PAY SOCALGAS'S RELOCATION COSTS UNDER SECTION 30631

Where, as here, there are multiple sources providing a
possible rule of decision—the statute, the UCA/Amended UCA,
and the licenses—but dictating different results, we must choose
the authority that best resolves the compensation issue. We
conclude the statute, as an express departure from the common
law rule, sets forth a plain, unequivocal directive that Metro
"shall" reimburse utilities for relocations occasioned by Metro's
construction. Metro's arguments to the contrary, based primarily
on the Amended UCA/UCA and the licenses, do not persuade us
to ignore the statute.

We begin with a review of the various property interests,
before turning to the statute.

14

### A. The Property Interests.

#### 1. *ROW*

The nature of the property interest embodied in railroad rights of way traces back to the mid- to late 1800s, when Congress passed the General Right-of-Way Act of 1875, which provided railroad companies with rights of way through public lands for the construction of railroads. (43 U.S.C. § 934, et seq.) The railroad companies did not have a fee interest;[7] instead, the interest the federal government granted the railroads was a "mere easement" over the land on which the railroads could lay tracks and run trains. (*Brandt Trust v. United States* (2014) 572 U.S. 93, 103 [134 S.Ct. 1257, 188 L.Ed.2d 272].) An easement is not a type of ownership, but rather is an incorporeal interest in land "'which confers a right upon the owner thereof to some profit, benefit, dominion, or lawful use out of or over the estate of another.' [Citations.]" (*Hansen v. Sandridge Partners L.P.* (2018) 22 Cal.App.5th 1020, 1032, italics omitted.) Easements are covenants that run with the land. (*Gamerberg v. 3000 East 11th Street LLC* (2020) 44 Cal.App.5th 424, 429 (*Gamerberg*).)

Courts have long recognized, however, that a right-of-way is more than an easement. (*Union Pacific Railroad Co. v. Santa Fe Pacific Pipelines, Inc.* (2014) 231 Cal.App.4th 134, 162 (*Union Pacific*).) Instead, "[i]t is an "'interest in the land, special and

---

7 A "fee" is the "highest, most exclusive estate in real property." (3 Miller & Starr, Cal. Real Estate (4th ed.) § 9.2.) A fee simple is an estate of indefinite duration, is "the largest interest that can exist in land," and is an "inheritable estate which the holder has the power to transfer by deed or by will." (3 Miller & Starr, Cal. Real Estate, (4th ed.) § 12.3; *Pacific Southwest Realty Co. v. County of Los Angeles* (1991) 1 Cal.4th 155, 163 [fee estate is of indeterminate duration].)

exclusive in its nature.'" [Citation.]" (*Ibid.*) *Union Pacific* observed that an easement at common law was "considered a nonpossessory and incorporeal interest in property[,]" but a "railroad right-of-way was an easement" with attributes of a fee, namely, perpetuity, exclusive use and possession, and remedies available to a fee interest. (*Ibid.*) Like a fee, it was "'corporeal, not incorporeal, property.' [Citation.]" (*Ibid.*)

A public ROW differs from a private ROW. As explained by our Supreme Court, "Public ways, as applied to ways by land, are usually termed 'highways' or 'public roads,' and are such ways as every citizen has a right to use. [Citation.] [¶] A private way relates to that class of easements in which a particular person, or a particular description or class of persons, [has or] have an interest or right as distinguished from the general public." (*Kripp v. Curtis* (1886) 71 Cal. 62, 64.)

As further explained in *Bello,* "The late 19th century saw a dramatic change in the judicially recognized scope of public rights-of-way in California. Before the widespread adoption of railroads, electricity, and the telephone, the term 'right-of-way' was given its literal meaning—a public right to construct, maintain, and use a road over private land. Any other use required the landowner's consent. [Citations.] Shortly before the turn of the century, however, the Supreme Court recognized that urbanization was placing a much greater demand on public resources than could be accommodated by this literal view of public rights." (*Bello, supra*, 121 Cal.App.4th at p. 308.) Furthermore, during this period of change, our Supreme Court approved of the principle that "'[t]he establishment of a public highway practically divests the owner of a fee to the land upon which it is laid out. . . ." (*Montgomery v. Santa Ana W.R. Co.*

16

(1894) 104 Cal. 186, 193.) "By contrast, the interpretation of easements held by private parties has not undergone the dramatic changes seen in public right-of-way cases." (*Schmidt v. Bank of America, N.A.* (2014) 223 Cal.App.4th 1489, 1505.)

### 2. *Franchises*

"A franchise to use public streets or rights-of-way is a form of property" interest; the "franchise fee is the purchase price of the franchise. [Citation.]" (*Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 262.) "'A franchise is a privilege conferred upon an individual or a corporation for use of a sovereign body's property. [Citation.]' [Citation.]" (*Riverside County Transportation Com. v. Southern California Gas Co.* (2020) 54 Cal.App.5th 823, 856 (*Riverside Transportation*).) "[S]ection 6202 authorizes a municipality to 'grant a franchise to any person, firm, or corporation . . . to use, or to lay and use, pipes and appurtenances for transmitting and distributing gas . . . under, along, across, or upon the public streets, ways, alleys, and places within the municipality . . . .' [Citation.]" (*Ibid*.) Franchises are created when a government agency authorizes private companies to locate infrastructure on public property to provide public utilities to the public, such as gas, water, telephone, or electricity across the streets and other public ways of a city. (*Saathoff v. City of San Diego, supra,* 35 Cal.App.4th at pp. 703-704.)

A private utility's franchise in a public street is a property interest created by contract, i.e., the franchise agreement. (*Southern Cal. Gas Co. v. City of Vernon* (1995) 41 Cal.App.4th 209, 218.)

17

### *3.     Licenses*

In contrast to an easement, a license is an interest that does not run with the land. When a landowner allows someone else to use their land, the owner grants a license. (*Shoen v. Zacarias* (2019) 33 Cal.App.5th 1112, 1119.) Unlike covenants that run with the land, a license is a personal right and confers no interest in land: "'it merely makes lawful an act that otherwise would constitute a trespass.' [Citations.]" (*Gamerberg, supra,* 44 Cal.App.5th at p. 429.) A license is a contract. (*Qualls v. Lake Berryessa Enters.* (1999) 76 Cal.App.4th 1277, 1283.)

### B.     *Section 30631 Abrogates the Common Law Rule and Requires Metro to Pay for Utility Relocations.*

As noted above, subdivision (b) of section 30631 provides, in relevant part: "The use of the streets, highways, freeways, and other public places by [Metro as successor to the Southern California Rapid Transit District[8]] for any of the purposes permitted herein is presumed to be no greater burden on adjoining properties than the uses existing as of August 22, 1964. If facilities, other than state highways or freeways . . . (including, but not limited to, streets, highways, pipelines, sewers, water mains, storm drains, poles, communications wires, and electric transmission wires) of another public agency, of the state, or of a private owner are necessarily required to be relocated, replaced,

---

8     "Section 30631 actually refers to 'the district,' meaning the former Southern California Rapid Transit District ([SC]RTD). (See § 30001.) However, [Metro] is the statutory successor to the [SC]RTD (§ 130050.2) and assumed all of the [SC]RTD's powers, duties, and obligations. (§ 130051.13.) Any statutory reference to the [SC]RTD is deemed to apply to [Metro]. (§ 130051.14.)" (*Pasadena Metro, supra,* 140 Cal.App.4th at p. 664, fn.4.)

18

or altered in order for [Metro] to construct or operate its system, or if the construction or operation by [Metro] of its system makes necessary the relocation, replacement, or alteration of any of those facilities of another public agency, of the state, or of a private owner in order to maintain the functioning of the facilities at their previous level of service, the facilities shall be relocated, replaced, or altered with reasonable promptness by the respective public corporation, state, or private owner and the district shall, by prior agreement, reimburse the public corporation, state, or private owner for the actual cost necessarily incurred in the relocation, replacement, or alteration."

### 1. *Principles of Statutory Construction.*

In interpreting a statute, our fundamental task is to ascertain the intent of the lawmakers to effectuate the purpose of the statute. (*Lincoln Unified School Dist. v. Superior Court* (2020) 45 Cal.App.5th 1079, 1090; *Coker v. JPMorgan Chase Bank, N.A.* (2016) 62 Cal.4th 667, 674.) We examine the statutory language, giving the words their usual and ordinary meaning, and "consider the language in the context of the entire statute and the statutory scheme of which it is a part [citation], harmonizing provisions relating to the same subject matter, to the extent possible." (*Satele v. Superior Court* (2019) 7 Cal.5th 852, 858-859.)

A statute is ambiguous if there is more than one reasonable interpretation of its language. (*Joannou v. City of Rancho Palos Verdes* (2013) 219 Cal.App.4th 746, 752.) If so, we turn to secondary rules of construction, including maxims of construction, the legislative history, and the wider historical circumstances of a statute's enactment. (*Ibid.*) We may look to

the ostensible objects to be achieved, the evils to be remedied, public policy, and contemporaneous administrative construction. (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 803.) If the meaning of the language is uncertain, courts should consider the consequences that will flow from a particular interpretation of the statute. (*Weatherford v. City of San Rafael* (2017) 2 Cal.5th 1241, 1252.) These consequences include how well the proffered interpretation can be harmonized with other provisions in the statutory scheme relating to the same subject matter. (See *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.)

Because common law provisions governing utility relocation exist, we must determine whether the statute displaces them. "In deciding whether a statutory scheme alters or displaces the common law, we begin with a presumption that the Legislature did not so intend. [Citations] To the extent possible, we construe statutory enactments as consonant with existing common law and reconcile the two bodies of law. [Citation.] Only 'where there is no rational basis for harmonizing' a statute with the common law will we conclude that settled common law principles must yield. [Citation.]." (*McMillin Albany LLC v. Superior Court* (2018) 4 Cal.5th 241, 249.) Further, although the presumption against displacement of the common law is strong, abrogation of the common law does not require an express declaration in the statute. It is sufficient that the language or evident purpose of the statute manifest a legislative intent to override the common law rule. (*Ibid.*)

Statutory construction is a question of law on which we exercise our independent judgment. (*California Disability Services Assn. v. Bargmann* (2020) 52 Cal.App.5th 911, 916.)

***2.  Section 30631 Requires Metro to Pay for
Utility Relocation.***

The common law rule of utility relocation is codified in
section 6297, and requires a utility using city streets pursuant to
a franchise to shoulder relocation costs when necessary to make
way for governmental use. (See § 6297; *Riverside Transportation,
supra,* 54 Cal.App.5th at p. 856; *Southern California Gas Co. v.
Los Angeles* (1958) 50 Cal.2d 713, 716.)[9] That "obligation arises

---

9       Both section 30361 and section 6297 abrogate the common
law rule in different ways. Section 6297 provides: "The grantee
[of a franchise] shall remove or relocate without expense to the
municipality any facilities installed, used, and maintained under
the franchise if and when made necessary by any lawful change
of grade, alignment, or width of any public street, way, alley, or
place, including the construction of any subway or viaduct, by the
municipality." Section 6297 differs from the common law rule in
several respects. In particular, it requires the utility to pay for a
relocation only "'when made necessary by any lawful change of
grade, alignment, or width of any public street, way, alley, or
place, including the construction of any subway or viaduct, by the
municipality . . . .' [Citation.]" (*Riverside Transportation, supra,*
54 Cal.App.5th at p. 858). "By contrast, the common law rule
applies when a relocation is necessary for *any* 'proper
governmental purpose.'" (*Ibid.*) "Also, as discussed, it applies
when the relocation is requested by *any* public entity, not just a
municipality, and not just the original grantor of the franchise."
(*Ibid.*) Because section 30631 controls, we need not consider
SoCalGas's assertion that the common law requires
reimbursement based upon the categorization of Metro's
construction of the LAX/Crenshaw line as a proprietary, as
opposed to governmental, function of government. (See, e.g.,
*Postal Telegraph-Cable Co. v. San Francisco* (1921) 53 Cal.App.

21

from the paramount right of the people as a whole to use public thoroughfares. [Citation.]" (*Pasadena Metro, supra,* 140 Cal.App.4th at p. 664.) To give a utility the right to compensation for relocation, the Legislature must do so specifically, which it did in enacting section 30631. (*Ibid.*)

Pasadena Metro* involved utility relocations occasioned by construction of the Gold line. (*Pasadena Metro, supra,* 140 Cal.App.4th at pp. 661-662.) Metro had begun the project. (*Id.* at p. 660.) But after cost overruns and legal problems, Metro created a new entity, the Pasadena Metro Blue Line Construction Authority (Authority), to complete it. (*Id.* at. p. 661.) Although Metro had routinely paid utility relocation costs, and the Authority had budgeted funds for such relocations, the Authority later refused to pay. (*Ibid.)* Instead, it paid utility relocation costs under protest, indicating it would seek reimbursement. (*Ibid.)* The Authority later sued to recover the relocation expenses, contending that section 30631 did not apply to it because it was a separate entity from Metro. (*Ibid.*) Division Eight of this court held the statute indeed applied to the successor entity, and that it required reimbursement of the utilities for their relocation expenses. (*Id.* at pp. 664-666.)

Pasadena Metro* articulated the legislative policy animating section 30631. (*Pasadena Metro, supra,* 140 Cal.App.4th at pp. 664-665.) "In short, if utilities must be moved or relocated in order to construct or operate a [Metro] transit system, a new and additional burden on such facilities is created and [Metro] must pay the relocation costs." (*Id.* at p. 665.) "In doing so, the

---

188, 191-194 [operation of municipal street railway system strictly within the exercise of city's proprietary function thereby requiring it to reimburse for utility relocation costs].)

Legislature must have determined that it would be unfair to force utilities to pay to relocate their own facilities when the need to do so arose only because [Metro] was constructing a mass transit project." (*Id.* at p. 666.) The court rejected "the notion that the Legislature intended to place that burden back on the utility companies simply because another entity stepped in to finish the project for [Metro]. . . . To hold otherwise leads to both mischief and an absurd result by allowing [Metro] to escape its obligations under section 30631 for no other reason than the fact that the Authority stepped in to complete the Gold Line for [Metro] with [Metro] funds." (*Ibid.*)

The plain language and purpose of section 30631 require Metro to reimburse SoCalGas. Section 30631, subdivision (b) expressly provides that Metro "shall" reimburse SoCalGas if it requires the utility to move its facilities. As our colleagues noted in *Pasadena Metro,* "the Legislature must have determined that it would be unfair to force utilities to pay to relocate their own facilities when the need to do so arose only because [Metro] was constructing a mass transit project." (*Pasadena, Metro, supra,* 140 Cal.App.4th at p. 666.) This statutory language displaces the common law and fulfills the statute's policy to reduce the burden on utilities when Metro constructs projects.[10]

---

10      *Riverside Transportation, supra,* 54 Cal.App.5th 823, held the Riverside County Transportation Commission, operator of Metrolink, had the authority to demand that SoCalGas relocate its pipeline operations at its own cost. (*Id.* at p. 875.) Both parties filed letters acknowledging the filing of *Riverside Transportation*, observing that it had no bearing on the section 30631 question because Riverside County is not subject to section 30631. As discussed *post,* however, *Riverside Transportation* does offer some insight on the trespass question.

23

We note another reason, not stated in *Pasadena Metro,* that the Legislature would require Metro to shoulder relocation costs is to ensure Metro appropriately considered and paid for all direct costs of building new public transit facilities. Otherwise, the true costs would be understated, and significant portions would be borne by utilities and their ratepayers, at least some of whom reside outside of Metro's service area. This could lead to skewed cost-benefit analyses and unfair burdens being imposed on utilities and non-residents.

For these reasons, we reject Amici's arguments that section 30631 would create problems for public transit systems to budget and/or plan for safe utility relocation. Nothing prevents transit authorities from consulting with utilities concerning utility relocation costs and/or safety considerations when planning new construction. The statute is limited in scope to Los Angeles County and provides notice that in Los Angeles County, utilities' reimbursement costs are mandated. Metro is therefore required to take these expenses into account when estimating the cost of new projects or modifications of its system.

### 3. The Clauses of the Licenses Requiring SoCalGas to Pay For Relocation Are Void as Contrary to The Public Policy Embodied in Section 30361.

California law provides that parties may not contract out of statutory obligations, and a contract that contravenes the public policy of a statute is unenforceable. (Civ. Code § 3513 ["law established for a public purpose cannot be contravened by private agreement"]; *McGill v. Citibank, N.A.* (2017) 2 Cal.5th 945, 961.)

Metro was created in 1964 to address the Los Angeles area's growing transportation problems." (Sen. Bill No. 41 (1964

1st Ex. Sess, § 1, ch. 1).) In the legislation, the Legislature declared its intention to create a transit agency with "sufficient power and authority to solve the transportation problems in the southern California area and to provide the needed comprehensive mass rapid transit system." (§ 30001, subd. (c).) SB 41 provided "this legislation is needed and useful; we believe that it is constructive legislation which will continue a major step toward the solution of Southern California's pressing traffic and public transportation problem." The law was to "be liberally construed to carry out the objects and purposes" of this transit policy. (§ 30002; *Rapid Transit Advocates, Inc. v. Southern Cal. Rapid Transit Dist.* (1986) 185 Cal.App.3d 996, 1000.)

The legislative history establishes that section 30361 promotes the purpose of the statute by facilitating Metro's power to acquire property and construct new transit projects. Such activity necessarily entails the relocation of utility lines, as recognized by section 30361, subdivisions (a) and (b). As discussed above, section 30631, subdivision (b) embodies the policy that when utilities are relocated because of Metro's construction, the utility should not be required to bear the cost.

As also discussed above, the licenses are contracts permitting SoCalGas to occupy Metro's ROW. Where, as here, the contracts contain unlawful provisions, those provisions may be severed from the contract if the purpose of the contract as a whole is not unlawful. (Civ. Code, § 1599; *Marathon Entertainment, Inc. v. Blast* (2008) 42 Cal.4th 974, 996.) Thus, while the requirement for SoCalGas to shoulder relocation expenses is unenforceable, the remainder of the licenses remain valid.

25

**C.   We Are Unpersuaded by Metro's Contrary Arguments.**

*1.   Metro's "Public" vs. "Private" Reading of Section 30631 Runs Contrary to the Statute's Plain Language and Policy.*

Metro argues section 30631 only applies to public property, not its "private" ROW. Metro highlights the statute's reference to "public" property: subdivision (a) states Metro's ability to "develop, own, [and] use . . . [transit] facilities . . . under, upon or over *public street[s], highways, bridges, or other public ways or waterways . . . .*" (Emphasis added.) In turn, subdivision (b) addresses Metro's use of the "streets, highways, freeways, and *other public places*" and triggers Metro's payment obligation when its "use *of the streets . . .  and other public places . . .* makes necessary the relocation . . .  of facilities," including pipelines. Finally, subdivision (c) provides for coordination of construction in the "street or highway involved." Metro contends section 30631 applies only to public, non-Metro owned property because if the Legislature had meant for Metro to pay for utility relocations no matter their location, it could have eliminated the language regarding "public" streets and other byways.

We disagree with Metro's conclusions for several reasons. First, Metro's ROW is not "private." It is owned by a public entity (Metro) and the ROW serves the interests of the general public by providing a route for public transit and other infrastructure serving the public. We need not decide, however, whether and to what extent Metro's ROW is a "public right of way," which under common law must be made available for public use, because the statute also refers to Metro's use of "other public places." (See *Schmidt v. Bank of America, N.A., supra,* 223 Cal.App.4th at p.

26

1501 ["'Unlike a private easement, the use rights of a public right-of-way are vested equally in each and every member of the public. [Citation.]'"].) Moreover, this case involves relocation of utilities located under streets, which are themselves public rights of way. (See *Bello, supra,* 121 Cal.App.4th at pp. 314-315 [the owner of property intersecting with a public street must yield to its public use by "every member of the public," including the placement of utility pipelines beneath the street].) Metro's ROW is a public place because it is public property and the places where it intersects streets are open to public use. Thus, the statute applies.

Finally, to the extent Metro argues the reference in section 30631, subdivision (a) to public streets, highways, etc. limits subdivision (b)'s reimbursement obligation solely to streets and other public byways, we disagree. We instead find subdivision (b)'s first two sentences address distinct topics. The first sentence states a presumption that Metro's use of streets, highways, etc. is "no greater burden than" that existing at the time of the statute's enactment in 1964. (§ 30631, subd. (b).) The second sentence addresses the relocation of facilities, public or private, occasioned by Metro's construction or operation of its systems; this sentence is not limited to public spaces. (*Ibid.*) Instead, the focus is upon the facilities that must be relocated because of Metro's operations, not the location of those facilities. (*Ibid.*)[11]

---

11    Given that we conclude Metro must reimburse SoCalGas under section 30361, we need not address Metro's contentions that the trial court erred in ruling that the Grant Deed language ("subject to all applicable laws") mandated reimbursement.

### 2. The UCA Requires Metro to Pay Relocation Costs and Overrides the Payment Provisions of the Licenses.

The UCA at section 8.1 specifically provides that Metro's predecessor (SCRTD) would reimburse SoCalGas for pipeline relocation: "The issuance of a Work Order shall obligate . . . [Metro] to reimburse [SoCalGas] for any activity or work performed or materials acquired for each Rearrangement,[12] in accordance with the terms of this Agreement; and such reimbursement shall be for the actual direct costs and indirect costs incurred by [SoCalGas] for such activities or work performed or materials acquired under the terms of this agreement . . . ."

While admitting that the original UCA allotted most relocation expenses to SCRTD, Metro attempts to demonstrate that in spite of the express provisions of the UCA and Amended UCA, the licenses' payment provisions still govern, as follows:

First, Metro asserts section 1.1.1. of the Amended UCA retains the licenses in their entirety by providing that "[t]his Amendment shall not negate or modify the terms and conditions of (a) any legally binding easements or other use and/or occupancy agreements between [SoCalGas] and [Metro] with respect to the occupancy by [SoCalGas] Facilities of, or any interest of [SoCalGas] in, real property owned by or under the

---

12  "Rearrangement" is defined as "the removal, replacement, alteration, reconstruction, or relocation of a Conflicting Facility or portion thereof for the purpose of construction and operating the Project or portion thereof, . . . ." (UCA, § 1.2(i).) A "Conflicting Facility" is defined as "that existing Facility that is so situated as to require Rearrangement because of interference with the Project." (UCA, § 1.2 (c).)

28

operating jurisdiction of [Metro], (b) any such easements or other agreements between [SoCalGas] and any former owner of real property now or hereafter owned by MTA, and to which [Metro] has become or hereafter becomes a successor either by assignment or by operation of law, or of (c) any such easements or other agreements between [SoCalGas] and any other governmental agency with respect to real property owned by or under the operating jurisdiction of such governmental agency, and in which [Metro] has a statutory or other right to install Transit Project Facilities." Metro interprets this to mean that the specific terms of the Metro-SoCalGas licenses prevail over the Amended UCA's terms.

Second, Metro asserts the Amended UCA defined "Transit Projects" and Transit Project ROW to mean "real property owned by Metro" and the parties agreed at paragraphs 1.1.2 and 1.2.17 that the Amended UCA addressed all Transit Projects after the amendment. Metro also interprets this to mean that the licenses still govern the reimbursement question.

Finally, Metro asserts the licenses are covered by the Amended UCA because they are "agreements" within section 1.1.1 and Metro is a successor to the licenses. Metro interprets this to mean that the licenses still govern the reimbursement question.

We conclude the UCA agreements, which the parties entered into well after the licenses, govern. The fundamental goal of contractual interpretation is "to give effect to the mutual intention of the parties[.]" (Civ. Code, § 1636; *Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 752 (*Mountain Air*).) "'We ascertain that intention solely from the written contract, if possible, but also consider the

circumstances under which the contract was made and the matter to which it relates. [Citations.]'" (*Starlight Ridge South Homeowners Assn v. Hunter-Bloor* (2009) 177 Cal.App.4th 440, 447 (*Starlight Ridge*); Civ. Code, § 1647.) "When the contract is clear and explicit, the parties' intent is determined solely by reference to the language of the agreement." (*Klein v. Chevron U.S.A., Inc.* (2012) 202 Cal.App.4th 1342, 1385; Civ. Code, § 1638.)

Under basic contract law, "several contracts relating to the same matters" are to be construed together. (Civ. Code, § 1642; *Mountain Air, supra,* 3 Cal.5th at p. 759.) *Mountain Air* construed two conflicting agreements between the same parties in order to determine that an attorneys' fees provision in one contract applied to the other contract. (*Mountain Air* at p. 759.) It found one agreement superseded the other. (*Id.* at pp. 759-760.) "'Whether the new contract was intended as a substitute for the old may be inferred where the terms of the new contract differ widely from those of the old, especially where the two are entirely inconsistent and cannot be operative at the same time.' [Citation.]" (*Id.* at p. 760.)

Further, a contract may be modified by another contract. (Civ. Code, § 1698, subd. (a) ["[a] contract in writing may be modified by a contract in writing"].) A modification may be implied by conduct or a writing modifying the original contract. (*Garrison v. Edward Brown & Sons* (1944) 25 Cal.2d 473, 479 [modification found where conduct of parties inconsistent with the written contract warrants conclusion parties intended to modify the written contract]; (*Thiele v. Merrill Lynch, Pierce, Fenner & Smith* (S.D. Cal. 1999) 59 F.Supp.2d 1060, 1064 [under

California law, subsequent writing could modify the terms of a previous contract].)[13]

By entering into the Amended UCA, the parties evidenced an intent to modify the licenses to the extent of their utility relocation payment provisions, and they did so by section 8.1 of the Amended UCA. A duty under a contract may be discharged by a subsequent inconsistent contract between the same parties. (29 Willison on Contracts (4th ed. 2021) Rescission by Inconsistent Subsequent Contract § 73:17, fns. omitted.) "A contract containing a term inconsistent with a term of an earlier contract between the same parties is interpreted as including an agreement to rescind the inconsistent term in the earlier contract. . . . [¶] The parties may or may not at the same time agree to rescind all the other provisions of the earlier contract." (*Ibid.*)

This is the case here. The Amended UCA superseded those provisions of the licenses that required SoCalGas to pay for removal and/or relocation of its facilities. (*Morgan v. Western Ho, Inc.* (1962) 200 Cal.App.2d 890, 891-892.) Thus, Metro cannot rely on the licenses to assert SoCalGas must pay for the

---

13     We conclude that a modification of the licenses, rather than a novation, occurred. A novation would effect a complete substitution of a new contract (obligation) in the place of the old contract. (Civ. Code, §§ 1530, 1531; *Wells Fargo Bank v. Bank of America* (1995) 32 Cal.App.4th 424, 431.) It must "'clearly appear' that the parties intended to extinguish rather than merely modify the original agreement. [Citation.]" (*Howard v. County of Amador* (1990) 220 Cal.App.3d 962, 977.) Because the licenses had provisions relating to property use, which continued in force, as well as relocation contingencies, the UCA/Amended UCA would not completely extinguish the licenses.

relocation because the payment provisions of the licenses no longer have any force or effect.

In any event, Metro was not and is not free to condition a utility's use of public streets or other public places on an agreement that the utility must pay to relocate its equipment if a new Metro project requires it. That would be contrary to section 30361, and the public policy embodied therein, and therefore would be prohibited.

### D.     SoCalGas Cannot Be Held in Trespass.

Metro asserts SoCalGas is trespassing on its ROW and seeks ejectment of SoCalGas's facilities. SoCalGas counters that under *Bello,* Metro's ROW must yield to a public utility, while Amici argue that the trial court's reading of *Bello* operated to give SoCalGas a prescriptive easement. We agree with SoCalGas. Moreover, Metro's efforts to force SoCalGas to pay for its utility relocation costs by revoking SoCalGas's license to use Metro's ROW, and then claiming SoCalGas is in trespass, are inconsistent with section 30631's mandate that Metro "shall" pay for utility relocations necessary for Metro's construction.

#### 1.     *Bello.*

In *Bello,* a county road that was a public ROW ran across the plaintiffs' property. (*Bello, supra,* 121 Cal.App.4th at p. 305.) The county gave a private gas company an encroachment permit, authorizing it to run its pipelines through the county's ROW and over the plaintiffs' property. (*Id* at p. 306.) The plaintiffs sued the gas company for trespass. (*Ibid.*) After a bench trial, the trial court found the gas company liable for trespass, reasoning that

32

use for a gas pipeline was not incidental to the original roadway purpose of the public right-of-way. (*Id.* at pp. 306-307.)

The Court of Appeal reversed, after summarizing two conflicting lines of California Supreme Court authority. (*Bello, supra,* 121 Cal.App.4th at pp. 307-308, 320.) The first line posited that a use not incident to the transit function of a roadway ROW constituted a trespass; thus, a defendant's installation of electric power lines in a rural county road right of way that crossed a defendant's ranch constituted a trespass. (*Gurnsey v. Northern California Power Co.* (1911) 160 Cal. 699, 705 (*Gurnsey*), 709; *Bello, supra,* 121 Cal.App.4th at p. 307.) The second line of authority, embodied in *Montgomery v. Santa Ana W.R. Co.* (1894) 104 Cal. 186 (*Montgomery*), held "that a municipality could grant a private company the right to construct and operate a railroad in a public right-of-way without the landowner's consent." (*Bello, supra,* 121 Cal.App.4th at p. 308.) *Montgomery* noted a "'wide distinction'" between a city street and a country highway; "while country roads were used only for surface transit, '[i]n the case of streets in a city there are other and further uses, such as the construction of sewers and drains, laying of gas and water pipes, erection of telegraph and telephone wires, and a variety of other improvements, beneath, upon, and above the surface, to which in modern times urban streets have been subjected.' [Citation.]" (*Id.* at p. 309.) Thus, due to development of more urbanized areas, "'[t]he trend of judicial opinion . . . is to a broader and more comprehensive view of the rights of the public in and to the streets and highways of city and country . . . .' [Citation.]" (*Ibid.*)

*Bello* concluded that *Gurnsey* is limited to roads "used solely for private surface transportation" in "'sparsely inhabited'" areas, which lack "the extensive infrastructure that accompanies

33

modern development." (*Bello, supra*, 121 Cal.App.4th at p. 312.)
Everywhere else, under *Montgomery*, "as a result of the demands
of urbanization, public rights-of-way located in developed areas
are subject to a wide range of 'other and further uses' besides
surface transportation, including the installation of sewage,
water, gas, and communications lines. [Citations.]" (*Id.* at p. 307.)
Even in "[r]ural Solano County," "the rights-of-way in the
countryside [are] as filled with the transmission hardware of
public services as were city rights-of-way in the time of
*Montgomery . . . .*" (*Id.* at pp. 312-313.)

Bello set forth standards to govern a municipality's power
to let a utility use its ROW over private land, finding that "a
proposed use of a public right-of-way should: (1) serve as a
means, or be incident to a means, for the transport or
transmission of people, commodities, waste products or
information, or serve public safety [citations]; (2) serve either the
public interest or a private interest of the underlying landowner
that does not interfere with the public's use rights [citation]; and
(3) not unduly endanger or interfere with use of the [fee owner's]
property. [Citation.]" (*Bello, supra,* 121 Cal.App.4th at pp. 315-
316.)

Applying these three criteria to the case before it, the court
found that the "pipeline serves precisely the public interest that
rights-of-way were intended to promote: efficient and effective
travel and transportation of goods." (*Bello, supra*, 121
Cal.App.4th at p. 316.) Also, there was "no evidence that the
pipeline presented any significant risk of danger or interference
with use of [the plaintiffs'] property." (*Id.* at p. 317.) Accordingly,
"[t]here [wa]s no basis for finding an abuse of discretion in the
issuance of an encroachment permit to [the gas company]." (*Ibid.*)

34

### 2. *Riverside Transportation.*[14]

Around 2012, the Riverside County Transportation Commission (Commission) commenced building a 24-mile-long commuter rail line that would extend the Metrolink system from Riverside to Perris. (*Riverside Transportation, supra*, 54 Cal.App.5th at p. 833.) The Commission had purchased pre-existing rail lines and used those routes to construct the Metrolink commuter rail. (*Ibid*.) At five points, the new rail line conflicted with SoCalGas's pipelines, which occupied the ROW pursuant to licenses with the Commission's predecessor ATSF, as well as city franchises. (*Id*. at pp. 831-833.) In the trial court, the Commission won a determination on summary judgment that SoCalGas was obligated to move pipelines at its own expense, but failed to prevail on its claim that SoCalGas had been trespassing after the Commission terminated the pipeline licenses. (*Id*. at p. 835.)

After rejecting the Commission's assertions that *Bello* did not apply to a railroad, *Riverside Transportation* addressed the effect of licenses upon SoCalGas's alleged trespass. (*Riverside Transportation, supra*, 54 Cal.App.5th at p. 849.) The court made the factual distinction that unlike *Bello*, which involved a county encroachment permit, SoCalGas's pipelines were installed pursuant to a city franchise. (*Id*. at p. 854.) It noted, however, that "this is a distinction without a difference; what counts is that [SoCalGas] installed them in a public right of way, with the permission of the public entity. Hence, under *Bello* it was entitled to do so, without the permission of [the railroad] or the

---

14    Riverside County has no equivalent of section 30631.

35

Commission, provided the installation met the *Bello* criteria."
(*Ibid.*)

Thus, *Riverside Transportation* analyzed the trespass question by breaking the issue into the three factual scenarios presented by the case. (*Riverside Transportation, supra*, 54 Cal.App.5th at pp. 854-855.) First, at one of the conflict points where there was no license, "*Bello* simply means there was no trespass at all" because the city held a street ROW over the railroad's property. (*Id* at p. 854.) Thus, neither the permission of the railroad nor the Commission was necessary, presumably based upon the franchises from the city. (*Ibid.) Riverside Transportation* concluded the pipeline satisfied the *Bello* criteria. (*Ibid.*)

In the second scenario, at the other four conflict points where SoCalGas had a license from the Commission, *Riverside Transportation* observed "*Bello* means that, in hindsight, [SoCalGas] did not really need *any* licenses to maintain its pipelines at *any* of the conflict points," presumably because the installation met the *Bello* criteria. (*Riverside Transportation, supra*, 54 Cal.App.5th at p. 855, original emphasis.) However, where a public utility has franchise rights to locate its facilities in a location and nonetheless enters into a license, the licenses supersede the franchises. (*Ibid.*) Ironically, in this instance, "the curious outcome is that [SoCalGas] has a *better* claim to the conflict point at which it had *no* license." (*Id.* at p. 855, original emphasis.)

The third scenario addressed SoCalGas's relocation of its pipelines to other places on the Commission's property. (*Riverside Transportation, supra*, 54 Cal.App.5th at p. 855.) *Riverside Transportation* observed there was evidence the Commission had

36

not consented to SoCalGas's placement, but also evidence it had done so, creating a factual issue. (*Ibid.*) This left the door open for SoCalGas to argue it could use those locations without the Commission's permission, while the Commission could argue SoCalGas's use of those locations would, under *Bello,* "unduly endanger or interfere with its use" of the ROW. (*Ibid.*)

In summary, *Riverside Transportation* observed that *Bello* means a utility can install some facilities in a public right-of-way without a license from the landowner, but the ruling did not upend the law regarding licenses. (*Riverside Transportation, supra,* 54 Cal.App.5th at p. 849.) Instead, it clarified when a license is needed. (*Ibid.*) "The utility and the landowner might well choose to enter into a license anyway—e.g., to prevent the landowner from claiming that the installation of the utility exceeds the three *Bello* criteria, or to provide for individualized terms regarding access or maintenance." (*Ibid.*)

### 3.    *Under* Bello *and Section 30631, SoCalGas Cannot Be Liable for Trespass.*

*Bello* and section 30631 tell us how to resolve competing real property interests (licenses, easements, franchises, and ROW) where transportation corridors, streets, and utilities coincide.[15] *Bello's* three-factor test allows the various interests to coexist while furthering the public interest. Moreover, section 30631 requires Metro to accommodate utilities located under streets or other public places and to reimburse utilities for facility

---

15    Unlike *Riverside Transportation,* which found factual issues precluded summary judgment, the parties here do not contend any factual issues exist.

relocations necessitated by Metro's new construction. By necessary implication the statute also prohibits Metro from ousting SoCalGas from its ROW to avoid shouldering relocation costs.

SoCalGas easily meets the three *Bello* criteria and therefore cannot be liable for trespass. First, its pipelines transport a needed commodity (natural gas); second, its transport of gas serves the public interest, namely, distribution of a necessary commodity; and third, its underground pipelines, before Metro commenced construction and required their relocation, did not interfere with the operation of Metro's ROW. (See *Bello, supra,* 121 Cal.App.4th at pp. 315-316.) Therefore, SoCalGas was not in trespass and cannot be ejected. (*Ibid*.)

Metro argues *Bello* does not apply, however, because its property rights under its ROW are superior to SoCalGas's rights to occupy the ROW. Metro argues its ROW is "private," giving it the power to exclude all persons, irrespective of licenses, or the property interests of third parties.[16] But Metro's ROW is owned by a public entity (Metro) and it serves the interests of the general public in providing transit. (See *Schmidt v. Bank of America, N.A., supra,* 223 Cal.App.4th at p. 1501.) Further, Metro's argument treats its ROW as a fee simple. It is not. Although a ROW is more than an easement, and constitutes an interest in land, it is nonetheless less than a fee. Metro's interest cannot be treated as exclusive given the needs of competing entities providing necessary public services, such as city streets and gas pipelines. As Metro acknowledges, where there are non-

---

16      In general, ownership in property confers three powers: possession, use, and disposition. (*United States v. General Motors Corp.* (1945) 323 U.S. 373, 377-378 [65 S.Ct. 357; 89 L.Ed. 311].)

exclusive easements, the easement holders must accommodate each other. (*Applegate v. Ota* (1983) 146 Cal.App.3d 702, 712; accord, *Scruby v. Vintage Grapevine, Inc.* (1995) 37 Cal.App.4th 697, 703.)

We are unmoved by Amici's argument that, in effect, the trial court's ruling gave SoCalGas a prescriptive easement on Metro's ROW. Metro is required to permit the City of Inglewood to use portions of the ROW for street purposes, and to permit SoCalGas use of its ROW for the essential transport of gas. (*Bello, supra,* 121 Cal.App.4th at pp. 315-316.) SoCalGas is not, and was not, in trespass.

Finally, Metro's effort to force SoCalGas to pay for its own utility relocation costs by terminating the former ATSF licenses permitting SoCalGas to use Metro's ROW, and then asserting a trespass claim, is inconsistent with section 30631's mandate that Metro "shall" pay for utility relocations made necessary by Metro's construction. To permit Metro to oust SoCalGas from the ROW to avoid paying for relocation of SoCalGas's facilities would be inconsistent with the Legislature's specific mandate that Metro reimburse utilities when relocations are required. As a creation of the Legislature, Metro is bound by the statute.

### 4. *Metro Forfeited Any Arguments Based on its Status as a Federally Regulated Railroad.*

Metro is a federal railroad common carrier under the jurisdiction of the U.S. Department of Transportation. (49 U.S.C. §§ 20100, et seq.) Based upon this status, Metro argues that conflicting state regulations are preempted. We conclude Metro forfeited this argument by not raising it below. "'As a general rule, theories not raised in the trial court cannot be asserted for

39

the first time on appeal; appealing parties must adhere to the theory (or theories) on which their cases were tried.'" (*Nellie Gail Ranch Owners Assn. v. McMullin* (2016) 4 Cal.App.5th 982, 997.) We reject any request that we exercise our discretion to decide the issue as a question of law for the first time on appeal. (*Daneshmand v. City of San Juan Capistrano* (2021) 60 Cal.App.5th 923, 937 [appellate court has discretion to consider issue of law for the first time on appeal].)

## DISPOSITION

The judgment of the superior court is affirmed. SoCalGas is awarded its costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


CURREY, J.


We concur:


MANELLA, P.J.


COLLINS, J.


40